STATE EX REL. INDIANA DEPARTMENT OF CONSERVATION
*v.* KIVETT

[No. 28,645.   Filed November 14, 1950.]

624

J. *Emmett McManamon,* Attorney General, *Clyde H. Jones,* Chief Counsel; *Frank A. Wieking* and *Lloyd C. Wampler,* Deputy Attorneys General, for appellant.

*Grafton J. Kivett,* of Martinsville; *S. C. Kivett, Sr.;* and *Kivett, Chambers, Vernon & Kivett,* all of Indianapolis, for appellee.

YOUNG, J.—Fundamentally this case involves the title to the bed of White River in Morgan County, Indiana, about one and a half miles upstream from the city of Martinsville, Indiana.

The complaint in the case was the usual form to enjoin the appellee from taking sand, gravel, stone and other minerals and substances from the bed of White River for an accounting for all such materials he has heretofore taken from said stream. To this complaint, the appellee, as defendant, filed answer in denial of all of the allegations thereof and a second paragraph alleging that the Indiana Department of Conservation is without authority to seek to recover money due the said State of Indiana and that the Auditor of State is the proper person to file such suit. Both parties filed a petition for special findings of fact and conclusions of law which were, in due course, handed down.

The case was submitted on a stipulation of facts and, in the preparation of such stipulation there had evidently been an abundance of investigation by both parties. The facts stipulated are that the west branch of White River in Morgan County, Indiana, ran in a southwesterly direction to a point where it joins the east branch of such White River and that such east branch after being joined by the west branch empties into the Wabash River at a point below the city of Vincennes, Indiana. The appellee owned adjacent land in Morgan County, Indiana, where he has a gravel rig or extractor through which he operates a drag line with dredge or bucket attached out over and into the bed of White River and has taken, and is now taking, and threatens to continue to take sand, stone, minerals and other substances from the bed of White River. He was notified on the 9th day of December, 1946, that it was unlawful for him to continue this operation without first procuring a permit therefor from the State of Indiana, and that it would be necessary for him to have a permit if he intended to continue such business.

From about 1821 to about 1855, White River was used for carrying cargoes of mess pork, prime pork, lard, ham shoulders, bulk port, flour, corn, bacon, lumber, venison hams, walnuts and other products from all points on White River in Morgan County to New Orleans, Louisiana. The flat boats ranged in size from boats 50 feet long, 12 feet wide and two feet deep with a capacity of 75,000 pounds, to boats 100 feet long, 20 feet wide, $3\frac{1}{2}$ feet deep and with a carrying capacity of 400,000 pounds. It was only during the months of February, March, April, and sometimes in May, that these barges proceeded down the river to New Orleans. There was evidence that 345 flat boats left Morgan County for New Orleans in the years 1829 to 1853, from which operations they made a net profit of $1,248,000. Photo-

static copies of letters, records, papers and documents of one Samuel Moore are in evidence, including insurance policies, receipts, letters and papers of said Samuel Moore. In addition to such downstream business, it appears that keelboats ascended the stream via the Wabash and White Rivers as far as Indianapolis, and that at the time of the admission of the State of Indiana into the Union, and for a long time prior thereto, White River had been used as a highway and a mode of travel by Indians, traders, explorers, missionaries and early settlers, and, in 1831, two steamboats reached Indianapolis via White River, one of which towed a loaded barge. There was also a showing that large cargoes of bacon, flour and salt were shipped down the Ohio River to the Wabash River and thence upstream as far as Indianapolis and there is a report in the record that a 15-ton keelboat brought salt from West Virginia to Indianapolis. There were a number of historical documents taken from the Indiana Historical Society. Such use of the river continued until about 1868, when the completion of the Indianapolis and Vincennes Railroad led to the abandonment of the river as a highway.

Reports by early engineers as to the navigability of White River make no distinction between Morgan, Marion, Johnson and Hamilton Counties, although there was evidence to the effect that in Morgan County there was a 44 per cent increase in the flow of water than at Indianapolis in 1946 and 1947. The use of the stream as a highway has at all times been limited to the flat and keelboats herein described, with the exception of some small craft, which were pushed upstream by poling and, upon two occasions, by small steamboats. That, with the exception of these boats and the canoes, skiffs and bateaux used by Indians, explorers, missionaries, traders and new settlers, all shipments were downstream.

It is the contention of the appellant that, in final analysis, there is but a single question before this court, i.e., who owns the bed of the west fork of White River in Morgan County? Appellant contends that the answer to this question depends upon the navigability of this stream when Indiana was admitted to the Union in 1816, and that the answer to this question is one to be determined by federal law.

Appellant further contends that it is clear from the record in the case that said river was available and open in its natural state for use of flatboats and keelboats, which were the usual and ordinary method at that time for transportation of property and passengers. It calls attention to the fact that we must remember that the first steamboat in operation in this country was on the Hudson River in 1807, and that it took a number of years for steamboats to reach remote sections of the country, such as Indiana was at that time. As a result, the natural and reasonable way of travel was by flatboats and keelboats and, when such traffic is shown to have occurred on White River, that is tantamount to a finding that White River, at that time, was navigable.

In *United States* v. *Holt State Bank* (1925), 270 U. S. 49, it is said:

"It is settled law in this country that lands underlying navigable waters within a State belong to the State in its sovereign capacity and may be used and disposed of as it may elect, subject to the paramount power of Congress to control such waters for the purposes of navigation in commerce among the states and with foreign nations, . . ."

In *United States* v. *Utah* (1931), 283 U. S. 64, it is said:

"In accordance with the Constitutional principle of the equality of States, the title to the beds of rivers within Utah pass to that State when it was admitted to the Union, if the rivers were then navigable . . . "

"The question of navigability is thus determinative of the controversy and is a federal question."

To the same general effect are *State* v. *Longyear Holding Company et al.*, (1947), 224 Minn. 451, 29 N. W. 2d 657; *United States* v. *Oregon* (1934), 295 U. S. 1-14; *Berney* v. *Keokuk* (1876), 94 U. S. 324.

Whether or not the waters of a state are navigable presents a question which must be decided under federal law and, under federal law, the rule is that a river is navigable in law which is navigable in fact. *The Daniel Ball* (1870), 77 U. S. (10 Wall.) 557; *Economy Light & Power Co.* v. *United States* (1921), 256 U. S. 113; *United States* v. *Appalachian Electric Power Co.* (1940), 311 U. S. 377; *Shively* v. *Bowlby* (1894), 152 U. S. 1.

Indiana is a part of the territory covered by an Ordinance of Congress of 1787, in which is found this language:

". . . The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory, as to the citizens of the United States, and those or any other states that may be admitted into the confederacy, without any tax, impost, or duty therefore." (Vol. 1, p. 288, Burns' 1933.)

Whether or not a stream is navigable is an issue of fact and depends upon whether or not it was available and was suspectible for navigation according to the general rules of river transportation at the time Indiana was admitted to the Union. It does

not depend upon whether it is now navigable, and the Supreme Court of the United States has held that such a test is not the fair one. *United States* v. *Holt State Bank, supra; United States* v. *Oregon, supra; Economy Light and Power Company* v. *United States, supra; United States* v. *Appalachian Electric Power Co., supra; Shively* v. *Bowlby, supra.*

So it seems that the correct test for determining the navigability of White River is whether or not it was susceptible and available for such use when the State was admitted to the union and it, therefore, is not material if upstream traffic offered difficulties. The true test seems to be the capacity of the stream, rather than the manner or extent of use. *The Montello* (1874), 20 Wall. 430, 22 L. Ed. 391; *United States* v. *Utah, supra; Economy Light and Power Co.* v. *United States, supra.* And the mere fact that the presence of sandbars or driftwood or stone, or other objects, which at times renders the stream unfit for transportation, does not destroy its actual capacity and susceptibility for that use. *Economy Light and Power Co.* v. *United States, supra; United States* v. *Utah, supra.*

It seems to follow from the authorities above cited, that Indiana, by virtue of the Ordinance of 1787, acquired title to the beds of the navigable waters of the State when Indiana, in fact, became a State and took what rights the Northwest Territory had in said area. If White River was susceptible of navigation, or available for navigation in 1816, it follows that the fee simple title to the beds of natural navigable streams passed to the State and the State could not part with title to such real estate, except by an act of the Legislature. There has been no act of the Legislature upon which appellee depends to which our attention has been called. He obtained his title

through a patent from the Federal government. After these remote grants the plaintiff never received a patent for any of the lands forming the bed of White River, and never was assessed, and never paid any taxes upon such land.

In connection with this discussion, we would like to call attention to two or three cases which seem to us to be pretty decisive of the case before us. In *United States* v. *Utah, supra,* there was an original suit by the United States to quiet title to land constituting the beds of the Colorado River and its tributaries, where they flow through the State of Utah. The matter was referred to a special master, to whose report exceptions were filed. Mr. Chief Justice Hughes delivered the opinion of the court, in the course of which he used the following language:

> "The controversy is with respect to certain facts, and the sufficiency of the basis of fact for a finding of navigability, rather than in relation to the general principles of law that are applicable. In accordance with the constitutional principle of the equality of states, *the title to the beds of rivers within Utah passed to that state when it was admitted to the Union, if the rivers were then navigable;* and if, they were not then navigable, the title to the river beds remained in the United States. . . ." (Our italics.)
>
> "The test of navigability has frequently been stated by this Court. In *The Daniel Ball,* 10 Wall. 557, 563, the Court said: 'Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.' In *The Montello,* 20 Wall. 430, 441, 442, it was pointed out that 'the true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, con-

ducted, nor the difficulties attending navigation,' and that 'it would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway.' The principles thus laid down have recently been restated in *United States* v. *Holt State Bank,* 270 U. S. 49, 56, where the Court said:

" 'The rule long since approved by this Court in applying the Constitution and laws of the United States is that streams or lakes which are navigable in fact must be regarded as navigable in law; that they are navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and further that navigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce.' "

"Recognizing the difficulties which are thus created, the master is plainly right in his conclusion that the mere fact of the presence of such sandbars causing impediments to navigation does not make a river non-navigable. It is sufficient to refer to the well-known conditions on the Missouri River and the Mississippi River. The presence of sandbars must be taken in connection with other facts making for navigability. In *The Montello, supra,* the Court said (p. 443): 'Indeed, there are but few of our fresh-water rivers which did not originally present serious obstructions to an uninterrupted navigation. In some cases, like the Fox River, they may be so great while they last as to prevent the use of the best instrumentalities for carrying on commerce, but the vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce. If this be so the river is navigable in fact, although its navigation may be encompassed with difficulties by reason of natural barriers such as rapids and sandbars."

We also call attention to the case of *United States* v. *Holt State Bank, supra,* wherein, on page 54, the court uses the following language:

> "*It is settled law in this country that lands underlying navigable waters within a State belong to the State in its sovereign capacity and may be used and disposed of as it may elect, . . .*"

In the case of *Economy Light & Power Co.* v. *United States, supra,* 256 U. S. 113, at page 117 of the opinion, the Court used the following language:

> "The District Court found that there was no evidence of actual navigation within the memory of living men, and that there would be no present interference with navigation by the building of the proposed dam. The Circuit Court of Appeals did not disturb this finding. 256 Fed. Rep. 792, 798. But both courts found that in its natural state the river was navigable in fact, and that it was actually used for the purposes of navigation and trading in the customary way, and with the kinds of craft ordinarily in use for that purpose on rivers of the United States, from early fur-trading days (about 1675) down to the end of the first quarter of the nineteenth century."

And on pages 123 and 124, the Court used the following language:

> "We concur in the opinion of the Circuit Court of Appeals that a river having actual navigable capacity in its natural state and capable of carrying commerce among the States, is within the power of Congress to preserve for purposes of future transportation, even though it be not at present used for such commerce, and be incapable of such use according to present methods, either by reason of changed conditions or because of artificial obstructions. . . ."

In addition to the other evidence, above outlined, is the decision of the Supreme Court in the case of *Cutler*

v. *Cox* (1828), 2 Blackf. 178, and the record in the case of *Robert C. Stalls, etc.* v. *Grant Stafford, Admr.*, filed in the Morgan Probate Court, February term, 1844. The first case was brought in trespass on the case and rules from the failure to comply with the terms of an agreement whereby Cox undertook to build a boat to be used in the New Orleans trade. The latter case has to do with the recovery from the administrator certain sums alleged by the plaintiff to be due as his share of partnership assets derived from the building of four boats to be used in freighting goods from Martinsville to New Orleans. There was a photostatic copy of an auction sale published in the Indianapolis Gazette on April 3, 1822, in which there was offered for sale salt and a keelboat of about 18 tons burden. Also there was a photostatic copy of the Indianapolis Journal on April 16, 1831, making rather prominent mention of the arrival at Indianapolis of the steamboat "General Hanna."

The appellee calls attention to the fact that there is no evidence in the record that there was ever any avulsion or change in the flow of the stream of White River at the place where appellee's gravelpit is located. This is true, but the record shows generally certain avulsions in the flow of the stream of White River, and, if the land of appellee had been included therein, it would have been a perfectly simple matter to have proved it, and, in the absence of such proof, we must assume that there was no such change in the flow of the stream of White River at the place where appellee's land lies.

Appellee also takes the position that in 1816, when Indiana was admitted to the Union, this part of the country was not inhabited, but that the first settlers of Morgan County arrived there in 1818 or 1819, and that the City of Indianapolis was not established until 1820. But this is not material in the decision of this case, for the use of the river a few years

later was sufficient to show its sufficiency and availability in 1816. *United States* v. *Utah, supra.*

Appellee relies largely upon the theory that White River was not navigable in 1816 at the place in Morgan County, which is the scene of the occurrence here involved, and they refer us to the case of *Hardin* v. *Jordan* (1891), 140 U. S. 371, 35 L. Ed. 428; *Arkansas* v. *Tennessee* (1918), 246 U. S. 158, 62 L. Ed. 638, and to the case of *Anderson-Tulley Co.* v. *Tingle* (1948), 166 F. 2d 224. These three cases simply take the position that the land emerging on either side of a navigable stream is a matter to be determined by the laws of each state involved, and in those cases it was held that the several states involved had given the bed of the stream to the owners of the abutting land, which is not the situation before us.

Appellees have cited six Indiana cases which, they say, would require this court to take judicial knowledge of the fact that such streams as White River are not navigable in the sense that the title to the bed and banks belong to the state, and that the trial court could take judicial notice of the fact that White River in Morgan County was not navigable. *Ross* v. *Faust* (1876), 54 Ind. 471; *Indianapolis Water Co.* v. *Kingan & Co.* (1900), 155 Ind. 476, 58 N. E. 715; *Illyes* v. *White River Light, etc., Co.* (1910), 175 Ind. 118, 123, 93 N. E. 670; *Depew* v. *Wabash & Erie Canal* (1854), 5 Ind. 8, 12; *Sizor* v. *The City of Logansport* (1898), 151 Ind. 626, 50 N. E. 377; *Brown* v. *Powers* (1914), 182 Ind. 145, 150, 104 N. E. 857. These cases, appellee contends, establish a ruling precedent and that under the rule of *stare decisis* have become a fixed part of the law in Indiana. These decisions, they say, have become rules of property and are binding upon strangers to the record.

In *Ross* v. *Faust, supra,* this court held that it had judicial knowledge of the fact that White River in

Marion County, Indiana, is neither a navigated nor navigable river. This court held in *Indianapolis Water Co.* v. *Kingan & Co., supra,* that the appellees had produced sufficient evidence in that case that the rights claimed by the Water Company had never been used. Outside of the building of the dam and levee there was neither a taking nor a possession of the river above the dam and held that the use of the river by flowage evidenced no broader claim than a right of flowage; and such a right is a mere easement; and citing *Ross* v. *Faust, supra,* held that White River runs through Marion County and is not navigable and that the title should pass, to the thread of a stream, and the title of the adjoining proprietors extends to the thread of the stream. After a discussion of the authorities, this court held that after possession for 20 years the conclusive presumption arises of a grant or right ample enough to protect the possession, and decided the case with the statement that the user by flowage evidenced no broader claim than a right of flowage and such right is a mere easement. In the case of *Illyes* v. *White River Light & Power Co., supra,* the appellee, by virtue of the act under which it was organized, undertook to condemn land of the appellant and the court said in passing: "White River, in Hamilton County, is not navigable and the title of riparian proprietors extends to the thread of the stream." Again citing *Ross* v. *Faust,* and *Indianapolis Water Co.* v. *Kingan & Co., supra,* it was held that the description of the land attempted to be condemned included land to the thread of the stream. It will be observed that in none of these cases was the State of Indiana a party. The appellant, in response to this, cites the cases of *United States* v. *Appalachian Electric Power Co.* (1940), *supra; Economy Light & Power Co.* v. *United States, supra,* and the case of

*United States* v. *Oregon, supra,* and quotes from this case as follows:

"Dominion over navigable waters and property in the soil under them are so identified with the sovereign power of government that a presumption against their separation from sovereignty must be indulged, in construing either grants by the sovereign of the lands to be held in private ownership or transfer of sovereignty itself. See *Massachusetts* v. *New York,* 271 U. S. 65, 89. For that reason, upon the admission of a State to the Union, the title of the United States to lands underlying navigable waters within the States passes to it, as incident to the transfer to the State of local sovereignty, and is subject only to the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce. But if the waters are not navigable in fact, the title of the United States to land underlying them remains unaffected by the creation of the new State. See *United States* v. *Utah, supra,* 75; *Oklahoma* v. *Texas, supra,* 583, 591. Since the effect upon the title to such lands is the result of federal action in admitting a state to the Union, the question, whether the waters within the State under which the lands lie are navigable or nonnavigable, is a federal, not a local one. It is, therefore, to be determined according to the law and usages recognized and applied in the federal courts, even though, as in the present case, the waters are not capable of use for navigation in interstate or foreign commerce. *United States* v. *Holt State Bank,* 270 U. S. 49, 55, 56; *United States* v. *Utah, supra,* 75; *Brewer-Elliott Oil Co.* v. *United States,* 260 U. S. 77, 87."

And it is true that all those cases decided was that White River is not or was not at the time of said decision a navigable stream. None of those cases involved land in Morgan County.

It is our conclusion that none of those cases had in them sufficient facts to be able to adjudicate the navi-

gability of White River in 1816, and that, there- fore, none of those cases is pertinent here. As between the parties and proprietors they are binding, but as between the State of Indiana and those parties they are not binding. We are not disposed to follow them.

In *Bissell Chilled Plow Works* v. *South Bend Mfg. Co.* (1916), 64 Ind. App. 1, 27, 11 N. E. 932, the Appellate Court in this case said: "The ultimate question here is between two riparian owners and the determination of their rights and duties as between themselves is not an adjudication of any right the public may have to abate any nuisance that may have been created and maintained by either or both of such riparian owners. *McQuiddy* v. *Ware* (1873), 20 Wall. 14, 22 L. Ed. 311; *City of Logansport* v. *Uhl* (1885), 99 Ind. 531, 539, 50 Am. Rep. 109; *Indiana, etc., R. Co.* v. *Eberle* (1887), 110 Ind. 542, 546, 11 N. E. 467; *Ryason* v. *Dunten* (1904), 164 Ind. 85, 91, 73 N. E. 74; 2 Wood, Nuisance (3d ed.), §§ 801, 802."

The case of *Cox* v. *State* (1883), 3 Blackf. 193, is presented to us. We will not attempt a detailed analysis of that case. Cox was indicted for obstructing the west branch of White River. He took the position he did it pursuant to a statute of the Legislature. This court, after considerable discussion of the law, held that the Legislature was without power to pass the statute involved and that Cox acted without authority when he proceeded in conformity thereto. The court held that the river was navigable.

It may be said that we have weighed the evidence in this case. If that be true, we refer to § 2-3229, Burns' 1946 Replacement, wherein it is said that "In all cases not now or hereafter triable by a jury, the Supreme and Appellate Courts shall, if required by the assignment of errors, carefully consider and weigh the evi-

dence and admissions heard on the trial when the same is made to appear by a bill of exceptions setting forth all the evidence given in the cause, and if, on such appeal, it appears from all the evidence and admissions that the judgment appealed from is not fairly supported by, or is clearly against the weight of the evidence, it shall be the duty of such court to award judgment according to the clear weight of the evidence, and affirm the judgment or return said cause to the trial court with instructions to modify the judgment or to grant a new trial; or to enter such judgment or decree as, to such court of appeal, may seem right and proper upon the whole case." *Gray, Trustee* v. *Union Trust Co. of Indianapolis* (1938), 213 Ind. 675, 697, 12 N. E. 2d 931, 14 N. E. 2d 532; *State Life Insurance Co.* v. *Cast* (1938), 214 Ind. 17, 13 N. E. 2d 705; *Parkison* v. *Thompson* (1905), 164 Ind. 609, 619, 73 N. E. 109; *Rooker* v. *Fidelity Trust Co., Trustee* (1931), 202 Ind. 641, 653, 177 N. E. 454; *Sallee* v. *Soules* (1907), 168 Ind. 624, 630, 81 N. E. 587; *State, ex rel.* v. *Board, etc.* (1905), 165 Ind. 262, 271, 74 N. E. 1091.

Where a cause of action is of exclusively equitable jurisdiction and the evidence is entirely in writing, the Supreme Court of this state is authorized by its inherent power and also by statute to render final judgment therein. In *State ex rel.* v. *Board, etc., supra,* we quote the following language from pages 271 and 272:

"This suit would have been of exclusively equitable jurisdiction under the law of this State prior to June 18, 1852, and belongs to that class of cases in which this court may review both the law and the facts. The evidence in this case being all written, we can judge of its probative force and effect as well as the trial court could, and are able to ascertain and declare the justice of the case. It is competent for this court, under such circumstances,

both by virtue of its inherent power and by the statute (Acts 1903, p. 338, § 8), to render such a decree in the premises as the justice of the case requires. The evidence being documentary and undisputed, it is manifest that the finding and judgment of the court below are contrary to law, and that a new trial would serve no useful purpose."

*Sallee* v. *Soules, supra,* involved an appeal from an interlocutory order appointing a receiver, wherein all the evidence was by affidavit and this court said, on p. 630: "The cause was heard wholly upon affidavits, and we are therefore in a position to weigh and determine for ourselves the weight of the evidence produced. *Hudelson* v. *Hudelson* (1905), 164 Ind. 694; *State, ex rel.* v. *Board, etc.* (1905), 165 Ind. 262. We have examined all the proofs submitted, and are satisfied that the action of the trial court is supported by a preponderance of such evidence."

There is no conflict in the written evidence in this case. The only conflict is in the conclusions that may be drawn from same. Accordingly, we have relied upon the statute which gives us the right to weigh the evidence and direct a verdict in favor of the person entitled to same. We have not overlooked appellee's contention that the conclusions of law are for the appellee and, using the yardstick used by appellee, we recognize that no question could be raised upon the evidence. However, in view of the statute and right of the court to direct a conclusion, we are disposed to do that. We do not think the position of the appellant is applicable in this case. Where the evidence is entirely in writing and the conclusions of law are contrary to what we think just and right, we may, and have elected not to consider further this point raised by appellee.

The judgment in this case is reversed and same is remanded to the trial court with directions to restate its conclusions of law in favor of appellant and to reopen the case for evidence on the question of damages.

NOTE.—Reported in 95 N. E. 2d 145.