

FILED

Dec 07 2016, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR
APPELLANTS/CROSS-APPELLEES

Michael V. Knight
Barnes & Thornburg LLP
South Bend, Indiana

Mark L. Phillips
Newby, Lewis, Kaminski & Jones, LLP
LaPorte, Indiana


ATTORNEYS FOR AMICUS CURIAE SAVE
OUR SHORELINE

David L. Powers
Smith, Martin, Powers, & Knier, PC
Bay City, Michigan

Keith A. Schofner
Lambert Leser
Bay City, Michigan


ATTORNEYS FOR AMICI CURIAE RAY
CAHNMAN, ET AL.

Mark Miller
Pacific Legal Foundation
Palm Beach Gardens, Florida

Paul Edgar Harold

ATTORNEYS FOR APPELLEES

Gregory F. Zoeller
Attorney General of Indiana

Andrea E. Rahman
Deputy Attorney General
Indianapolis, Indiana


ATTORNEY FOR APPELLEE/CROSS-
APPELLANT, ALLIANCE FOR THE
GREAT LAKES AND SAVE THE
DUNES

Jeffrey B. Hyman
Conservation Law Center
Bloomington, Indiana


ATTORNEYS FOR
APPELLEES/CROSS-APPELLANTS
LONG BEACH COMMUNITY
ALLIANCE, ET AL.

Kurt R. Earnst
Braje, Nelson & Janes, LLP
Michigan City, Indiana

Patricia F. Sharkey
Environmental Law Counsel, PC
Chicago, Illinois

LaDue, Curran & Kuehn, LLC
South Bend, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Don H. Gunderson and Bobbie
J. Gunderson, Co-Trustees of the
Don H. Gunderson Living Trust
Dated November 14, 2006,

*Appellants/Cross-Appellees/Plaintiffs,*

v.

State of Indiana, Indiana
Department of Natural
Resources,

*Appellees/Defendants,*

Alliance for the Great Lakes and
Save the Dunes,

*Appellee/Cross-Appellant/*

*Intervenor-Defendant,*

Long Beach Community
Alliance, Patrick Cannon, John
Wall, Doria Lemay, Michael
Salmon, and Thomas King,

*Appellees/Cross-Appellants/*

*Intervenor-Defendants.*

December 7, 2016

Court of Appeals Case No.
46A03-1508-PL-1116

Appeal from the LaPorte Superior
Court

The Honorable Richard R.
Stalbrink, Jr., Judge

Trial Court Cause No.
46D02-1404-PL-606

**May, Judge.**

"The shores of the Great Lakes may look serene, but they are a battleground. Members of the public enjoy using the shores for fishing, boating, birding, or simply strolling along and taking in the scenic vistas." Kenneth K. Kilbert, *The Public Trust Doctrine and the Great Lakes Shores*, 58 Clev. St. L. Rev. 1, 2 (2010). "Repeatedly, however, owners of land bordering the Great Lakes (*i.e.*, littoral owners), armed with deeds indicating they own the shore to the water's edge or even lower, have tried to stop members of the public from using their property above the water's edge." *Id*. (internal footnotes omitted). Today we are called on to decide one such case.

Don H. Gunderson and Bobbie J. Gunderson, as trustees of the Don H. Gunderson Living Trust (collectively, "Gunderson"), sought a declaratory judgment that their Lake Michigan property extends to the water's edge, wherever the water's edge is at any given moment. The State of Indiana and the Indiana Department of Natural Resources ("DNR") (collectively, "State"), Alliance for the Great Lakes and Save the Dunes ("Alliance-Dunes"), and Long Beach Community Alliance ("LBCA"),[1] argued the State holds in trust for the public all land up to the ordinary high water mark ("OHWM"), regardless whether that land is covered by water.

The trial court granted summary judgment for the State and the Intervenors. We affirm in part and reverse in part.

---

[1] We will refer to Alliance-Dunes and LBCA collectively as "the Intervenors."

# Facts and Procedural History[2]

[4] Gunderson owns three lots in Long Beach, Indiana ("Gunderson Property"). The trial court found, "The Gunderson's deed, the plat to which the deed refers, and the survey of the plats reference no northern dimension other than that the lots are within Section 15." (Appellants' App. at 26.) The deed[3] for the property incorporates by reference a 1914 plat map of Long Beach, which shows the Gunderson Property is located in Section 15 of the township. The Gunderson Property is shown on the plat as a series of rectangular boxes with a northern boundary. A 1984 survey identifies the northern boundary of the Gunderson Property as "lake edge." (*Id.* at 127.) A survey from 1829 indicates an irregular property line on the northern border of Section 15, beyond which is labeled, "Lake Michigan." (*Id.* at 585-7.)

[5] On April 4, 2014, Gunderson brought a motion for a declaratory judgment and to quiet title against the State, claiming he owns all land to the water's edge and the public has no rights to any land not covered by water, as that land is his.[4] On June 2, 2014, Alliance-Dunes filed a motion to intervene, which was

---

[2] We heard oral argument at the Indiana Statehouse on September 8, 2016. We commend counsel on the quality of their oral advocacy.

[3] The legal description provided in the deed indicates the Gunderson Property encompasses "Lot 240, 242, and 244," (App. at 110), which correspond to the location of Section 15 on the 1914 plat map.

[4] Gunderson filed an amended complaint on April 7, 2014.

granted. On July 1, 2014, LBCA filed a motion to intervene; that motion was granted on October 20, 2014.

[6] On October 31, 2014, Gunderson moved for summary judgment. Subsequently, the State filed a cross-motion, as did the Intervenors (collectively "Defendants"). On April 22, 2015, the trial court held a hearing on all motions. On July 24, 2015, the trial court denied Gunderson's summary judgment motion and granted the cross-motions filed by the Defendants.[5] It found and concluded:

> Therefore, as to ownership, this Court finds that the Gundersons own legal title, *jus privatum*, in their lots to the northern boundary of Section 15. Further, this Court finds that the State holds *jus publicum*, in public trust, the land below the OHWM, as defined by 312 Ind. Admin. Code 1-1-26(2). Moreover this Court finds that the Gundersons cannot unduly impair the protected rights and uses of the public when the titles to the land overlap.

(*Id*. at 28.)

[7] Gunderson filed his notice of appeal on August 10, 2015 ("Gunderson Appeal"). On August 11, 2015, Alliance-Dunes filed a combined motion for clarification and to correct error. On August 13, 2015, LBCA also filed a motion to correct error. On August 20, 2015, the State filed its responses to the Intervenors' respective motions. On October 15, 2015, the trial court scheduled

---

[5] The trial court issued an Amended Order on August 3, 2015, as "the first two lines of Paragraph 46 were inadvertently cut from page 15 during printing." (App. at 34.)

a hearing on the Intervenors' motions for December 18, 2015. On October 23, 2015, this court granted a joint motion for temporary stay of appellate proceedings due to the pending motions from the Intervenors.

[8] On November 9, 2015, Alliance-Dunes filed "Combined Motions to Take Judicial Notice of Facts, to Supplement the Record, and for Leave to Amend Alliance-Dunes' Motion for Clarification and Motion to Correct Error." ("Judicial Notice Motion") (Alliance-Dunes App. at 25.) On November 23, 2015, the trial court issued an order granting Alliance-Dunes Judicial Notice Motion "unless an objection is filed within 10 days from the date of this Order." (Id. at 90.) On November 30, 2015, Gunderson filed an objection, and on December 7, 2015, the State filed its objection to the Alliance-Dunes Judicial Notice Motion. The trial court held a hearing on all pending matters on December 18, 2015, and denied all pending motions on December 21, 2015. Alliance-Dunes appealed the trial court's denial of its Judicial Notice Motion and we consolidated that appeal and the Gunderson Appeal into the current case.

# Discussion and Decision

[9] When reviewing summary judgment, we stand in the shoes of the trial court and apply the same standards in deciding whether to affirm the ruling. *Allen Gray Ltd. P'ship IV v. Mumford*, 44 N.E.3d 1255, 1256 (Ind. Ct. App. 2015). Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter

of law. *Id.* That standard requires us to construe all factual inferences in favor of the nonmoving party, and to resolve all doubts as to the existence of an issue of material fact against the moving party. *Id.*

[10] A ruling on a motion for summary judgment comes before this court clothed with a presumption of validity. *Id.* Accordingly, the party appealing a summary judgment bears the burden of persuading us that the trial court's ruling was improper. *Id.* Nevertheless, we carefully review a decision on summary judgment to ensure that a party was not improperly denied its day in court. *Id.* Where, as here, the trial court makes findings and conclusions in support of its entry of summary judgment, we are not bound by such findings and conclusions, but they aid our review by providing reasons for the decision. *Id.* We will affirm a summary judgment on any theory or basis found in the record. *Id.*

## Public Trust Rights

[11] Under English law, all navigable waters and the land beneath them were held in trust by the sovereign for the benefit of the public. *Murphy v. Dep't of Nat. Res.*, 837 F. Supp. 1217, 1219 (S.D. Fla. 1993), *aff'd*, 56 F.3d 1389 (11th Cir. 1995). This arrangement has become known as the public trust doctrine, *id.*, and was adopted by the United States Supreme Court, such that "shores" were public trust land:

> For it was expressly enjoined upon [the Duke of York], as a duty
> in the government he was about to establish, to make it, as near
> as might be, agreeable, in their new circumstances, to the laws

and statutes of England; and how could this be done, if in the charter itself, this high prerogative trust was severed from the regal authority? If the shores, and rivers and bays and arms of the sea, and the land under them, instead of being held as a public trust for the benefit of the whole community, to be freely used by all for navigation and fishery, as well for shell-fish as floating fish, had been converted by the charter itself into private property, to be parcelled out and sold by the duke, for his own individual emolument? There is nothing, we think, in the terms of the letters-patent, nor in the purposes for which it was granted, that would justify this construction.

*Martin v. Waddell's Lessee*, 41 U.S. 367, 413 (1842). This remained true after independence:

This right of eminent domain over *the shores* and the soils under the navigable waters, for all municipal purposes, belongs exclusively to the states within their respective territorial jurisdictions, and they, and they only, have the constitutional power to exercise it. To give to the United States the right to transfer to a citizen the title *to the shores* and the soils under the navigable waters, would be placing in their hands a weapon which might be wielded greatly to the injury of state sovereignty, and deprive the states of the power to exercise a numerous and important class of police powers.

*Pollard v. Hagan*, 44 U.S. 212, 230 (1845) (emphasis added). Thus, States that joined the Union after the original thirteen acquired from the federal government rights in the lands within the state, "including the lands between the high and low tide marks and the water that periodically covers it." *Murphy*, 837 F. Supp. at 1219.

When Indiana became a state in 1816 it acquired ownership of the beds of its navigable waters. *State ex rel. Ind. Dep't of Conservation v. Kivett*, 228 Ind. 623, 629-30, 95 N.E.2d 145, 148 (1950). That title, sometimes called "equal footing"[6] title, is "different in character from that which the state holds in lands intended for sale . . . . It is a title held in trust for the people of the state*." Illinois Cent. R. Co. v. State of Illinois*, 146 U.S. 387, 452 (1892). After equal footing lands are passed at statehood, the land is governed by state, and not federal, law. *See PPL Montana, LLC v. Montana*, __ U.S. __, 132 S. Ct. 1215, 1235 (2012) (states retain residual power to determine the scope of the public trust over waters within their borders, while federal law determines riverbed title under the equal-footing doctrine). A private landowner cannot impair the protected rights of the public. *Lake Sand Co. et al. v. State ex rel. Attorney General*, 68 Ind. App. 439, 444, 120 N.E. 714, 716 (1918).

[13] In 1995, our legislature adopted Ind. Code ch. 14-26-2, which provides the Indiana public has a vested right in the preservation, protection, and enjoyment of all the public freshwater lakes of Indiana and the use of the public freshwater lakes for recreational purposes. Ind. Code § 14-26-2-5. It provides the State has full power and control of all of the public freshwater lakes in Indiana, and holds

---

[6] In 1842, the United States Supreme Court declared that, for the thirteen original states, the people of each state, based on principles of sovereignty, "hold the absolute right to all their navigable waters and the soils under them," subject only to rights surrendered and powers granted by the Constitution to the Federal Government. *PPL Montana, LLC v. Montana*, __ U.S. __, 132 S. Ct. 1215, 1227 (2012). In a series of 19th-century cases, the Court "determined that the same principle applied to States later admitted to the Union, because the States are coequal sovereigns under the Constitution." *Id.*

and controls all public freshwater lakes in trust for the use of all of the citizens of Indiana for recreational purposes. *Id.* A person owning land bordering a public freshwater lake does not have the exclusive right to the use of the waters of the lake or any part of the lake. *Id.* But that section expressly excludes Lake Michigan: "This chapter does not apply to . . . Lake Michigan[, l]and under the waters of Lake Michigan[, and a]ny part of the land in Indiana that borders on Lake Michigan."[7] *Id.*

[14] Gunderson characterizes that chapter as a codification of the public trust doctrine and argues there is no public trust doctrine applicable to his land because "Indiana expressly excluded Lake Michigan from its public trust doctrine." (Amended Br. of Appellants at 28.) Therefore, Gunderson contends he "paid for his property and as such has the right to exclude others." (*Id.* at 30.)

[15] The trial court found:

> Indiana did not surrender the public trust encumbering Lake Michigan's shores by partially codifying the public trust doctrine as it applied to the smaller freshwater lakes in Indiana. That [ ] land below the OHWM has not been excluded from Indiana's common law public trust doctrine. Furthermore, this Court

---

[7] Gunderson says "Three times crowed the General Assembly; there is no recreational right to any part of the land abutting Lake Michigan." (Amended Br. of Appellants at 28.) Therefore, "Gunderson paid for his property and as such has the right to exclude others." (*Id.* at 30.) That is not what the General Assembly "crowed." It said only that Ind. Code ch. 14-26-2 does not apply to Lake Michigan. The trial court correctly determined the exclusion of Lake Michigan does not mean there are no public trust rights. Rather, it reflects there was no intent to change the common law with regard to Lake Michigan. *See, e.g., Shively v. Bowlby*, 152 U.S. 1, 41 (1894) (when there was no administratively-set OHWM, there existed a common-law OHWM).

notes that Indiana has the least amount of shoreline along Lake Michigan. Moreover, this Court finds the idea that Indiana, with such a limited amount of shoreline, would restrict and in effect deny its citizens' [sic] access to such an amazing resource. [sic] Granting near exclusive rights to a vast portion of the shoreline to a select few homeowners, to be a far stretch of reason and common sense. [sic]

(Appellants' App. at 20.)

[16] We decline to hold the exclusion of Lake Michigan from that statute represents the legislature's statement there are no public trust rights in the shore of Lake Michigan. Gunderson relies primarily on *Bainbridge v. Sherlock,* 29 Ind. 364, 367 (1868), in which our Indiana Supreme Court held:

The Ohio [R]iver is a great navigable highway between states and the public have all the rights that by law appertain to public rivers as against the riparian owner. But there is not "shore," in the legal sense of that term; that is, a margin between high and low tide -- the title to which is common. The banks belong to the riparian owner, and he owns an absolute fee down to low water mark.

However, it seems, based on the language specifically applying the holding regarding the riparian rights to the "navigable highway between states . . . [where there] is not 'shore,'" *id.,* the holding in *Bainbridge* applied to rivers, not lakes as we have here. *Compare Kivett*, 95 N.E.2d 145 (regarding the use of resources protected by public trust on a river), and *Lake Sand*, 120 N.E.2d 714 (regarding the use of resources protected by public trust on a lake); *and compare*

Ind. Code art. 14-29 (regulating navigable rivers, streams, and waterways) with Ind. Code art. 14-26 (regulating lakes and reservoirs).

[17] We do not believe the exclusion of Lake Michigan from Indiana Code ch. 14-26-2 demonstrates legislative intent that there be no public trust rights to the shore. We presume the legislature is aware of the common law and intends to make no change therein beyond its declaration either by express terms or unmistakable implication. *Clark v. Clark*, 971 N.E.2d 58, 62 (Ind. 2012). There was no such express declaration here, nor do we characterize the statutory language as leaving an "unmistakable implication." Thus, the rights to the shore of Lake Michigan are controlled by the common law public trust doctrine.

## Scope of Public Trust Rights

[18] As we have concluded public trust rights exist, we must now consider their scope. Regarding the nature of the public trust rights relative to Lake Michigan, the trial court found:

> The Gundersons have provided no evidence and no persuasive argument for finding that the recreational activities, such as swimming and walking on the beach, should not also be permissible public uses protected by the public trust doctrine. This Court notes that several other states, including some of our sister Great-Lake States, have recognized the public trust's protection for recreational enjoyment of the beach.

(Appellants' App. at 20.)

[19] The states retain residual power to determine the scope of the public trust over waters within their borders. *PPL Montana*, __ U.S. at __, 132 S. Ct. at 1235. Some Great Lakes states have determined the public trust rights include recreational uses such as swimming, walking along the shore, and preservation of scenic beauty. *E.g., People ex rel. Scott v. Chicago Park Dist.*, 360 N.E.2d 773, 780 (Ill. 1976) (public trust doctrine, like all common law principles, should not be considered fixed or static, but should be molded and extended to meet changing conditions and needs of the public it was created to benefit); *R.W. Docks & Slips v. State*, 628 N.W.2d 781, 787-88 (Wis. 2001) (public trust doctrine originally existed to protect commercial navigation, but has been expansively interpreted to safeguard the public's use of navigable waters for purely recreational purposes such as boating, swimming, fishing, hunting, recreation, and to preserve scenic beauty), *cert. denied sub nom. R.W. Docks & Slips v. Wisconsin*, 534 U.S. 1041 (2001)). The scope of public trust rights in Indiana is an issue of first impression.[8]

[20] Granting lakeshore owners the right to exclude the public from land between the low and high water marks would be inconsistent with the public trust doctrine because, under that doctrine, a state holds the title to the beds of navigable lakes and streams below the natural high-water mark for the use and

---

[8] In *United States v. Carstens*, 982 F. Supp. 2d 874, 878 (N.D. Ind. 2013), the district court said: "The land between the edge of the water of Lake Michigan and the ordinary high water mark is held in public trust by the State of Indiana." It cited *Ill. Cent. R. Co. v. State of Illinois*, 146 U.S. 387 (1892), and *Lake Sand*, 68 Ind. App. 439, 120 N.E. 714 (1918), but neither of those decisions directly supports the *Carstens* language about the "ordinary high water mark."

benefit of the whole people. *In re Sanders Beach*, 147 P.3d 75, 79 (Idaho 2006), *reh'g denied*. In *Sanders Beach*, lakefront property owners sought a ruling that their littoral rights gave them authority to exclude the public from that portion of the abutting lakebed not covered by water. The Court determined that creating the littoral right they wanted "would give them the exclusive right to occupy this portion of state land, even though the state holds such land in trust" for the public:

> Such littoral right would be contrary to the central substantive thought in public trust litigation, which we have stated is as follows: [w]hen a state holds a resource which is available for the free use of the general public, a court will look with considerable skepticism upon any governmental conduct which is calculated either to relocate that resource to more restricted uses or to subject public uses to the self-interest of private parties.

*Id*. at 86 (quoting J. Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 473, 490 (1970)). The Court therefore declined to create the littoral right requested by the lakeshore owners. "Their littoral rights do not include the right to exclude the public from that portion of the exposed lake bed lying below the OHWM." *Id*.

[21] Gunderson argues that land is either submerged or it is not, and asserts he owns whatever is not under water at any given moment.[9] We find persuasive the

---

[9] Gunderson also relies on *Bainbridge* as limiting the public right in navigable waters, asserting the public right is "for passage, navigation, and commerce . . . . No more, no less." (Amended Br. of Appellants at 26.) However, as noted *supra*, *Bainbridge* is inapplicable here, as its holding governs riparian rights along a river for which there was no "shore," not lake-based riparian rights. *Compare Kivett*, 95 N.E.2d 145 (regarding the use

Michigan Supreme Court's analysis in *Glass v. Goeckel*, 703 N.W.2d 58 (Mich. 2005), *reh'g denied*, *cert. denied sub nom Goeckel v. Glass*, 546 U.S. 1174 (2006). It addressed a dispute similar to that before us – *i.e.*, whether the public trust land extends up to the ordinary high water mark or whether, as Gunderson argues, it applies only to land that is actually under water at any particular moment.

[22] The *Glass* Court addressed "the established distinction" in public trust jurisprudence between public rights (*jus publicum*) and private title (*jus privatum*). *Id*. at 69. It noted:

> Cases that seem to suggest, at first blush, that the public trust ends at the low water mark actually considered the boundary of the littoral owner's private property (*jus privatum*) rather than the boundary of the public trust (*jus publicum*). Because the public trust doctrine preserves public rights separate from a landowner's fee title, the boundary of the public trust need not equate with the boundary of a landowner's littoral title. Rather, a landowner's littoral title might extend past the boundary of the public trust. Our case law nowhere suggests that private title necessarily ends where public rights begin. To the contrary, the distinction we have drawn between private title and public rights demonstrates that the *jus privatum* and the *jus publicum* may overlap.

*Id*. at 69-70. *See also State v. Korrer*, 148 N.W. 617, 623 (Minn. 1914) (even if a riparian owner holds title to the ordinary low water mark, his title is absolute

---

of resources protected by public trust on a river) with *Lake Sand*, 120 N.E.2d 714 (regarding the use of resources protected by public trust on a lake); *and compare* Ind. Code art. 14-29 (regulating navigable rivers, streams, and waterways) with Ind. Code art. 14-26 (regulating lakes and reservoirs).

only to the ordinary high water mark; the intervening shore space between high and low water mark remains subject to the rights of the public); *Shaffer v. Baylor's Lake Ass'n, Inc.*, 141 A.2d 583, 585 (Pa. 1958) (subjecting private title held to low water mark to public rights up to high water mark); *Bess v. Humboldt Co.*, 5 Cal. Rptr. 2d 399, 401 (Cal. Ct. App. 1992) (noting that it is "well settled" that riparian title to the low water mark remained subject to the public trust between high and low water marks).

[23] Establishing property rights based on the OHWM attempts to account for the fact that water levels in the Great Lakes fluctuate. *Glass*, 703 N.W.2d at 71. This fluctuation results in temporary exposure of land that may then remain exposed above where water currently lies. *Id*. This land, although not immediately and presently submerged, falls within the ambit of the public trust because the lake has not permanently receded from that point and may yet again exert its influence up to that point. *Id*. The *Glass* Court noted "the precise location of the ordinary high water mark at any given site on the shores of our Great Lakes remains a question of fact[.]" *Id*. at 73.

[24] As to the scope of the public trust rights, the *Glass* Court held that "walking along the shore, subject to regulation (as is any exercise of public rights in the public trust) falls within the scope of the public trust." *Id*. As trustee, the state must preserve and protect specific public rights below the ordinary high water mark and may permit only those private uses that do not interfere with these traditional notions of the public trust. *Id*. Yet its status as trustee does not permit the state to secure to itself property rights held by littoral owners. *Id*.

The *Glass* Court determined

> walking along the lakeshore is inherent in the exercise of
> traditionally protected public rights. Our courts have
> traditionally articulated rights protected by the public trust
> doctrine as fishing, hunting, and navigation for commerce or
> pleasure. In order to engage in these activities specifically
> protected by the public trust doctrine, the public must have a
> right of passage over land below the ordinary high water mark.
> Indeed, other courts have recognized a "right of passage" as
> protected with their public trust. We can protect traditional
> public rights under our public trust doctrine only by
> simultaneously safeguarding activities inherent in the exercise of
> those rights. Walking the lakeshore below the ordinary high
> water mark is just such an activity, because gaining access to the
> Great Lakes to hunt, fish, or boat required walking to reach the
> water.

*Id*. at 73-75 (citations omitted). The *Glass* Court concluded with two *caveats*:

> By no means does our public trust doctrine permit every use of
> the trust lands and waters. Rather, this doctrine protects only
> limited public rights, and it does not create an unlimited public
> right to access private land below the ordinary high water mark.
> The public trust doctrine cannot serve to justify trespass on
> private property. Finally, any exercise of these traditional public
> rights remains subject to criminal or civil regulation by the
> Legislature.

*Id*. at 75 (citation omitted).[10]

---

[10] We acknowledge some other Great Lakes courts have been more protective of private property rights. *See e.g., State ex rel. Merrill v. Ohio Dep't of Nat. Res.*, 955 N.E.2d 935 (Ohio 2011), where Lake Erie property

[26] Following the holding and reasoning in *Glass*, we conclude Gunderson's private rights are able to co-exist with those rights of the public trust. Therefore, the land at issue below the OHWM is open to limited public use, such as gaining access to the public waterway or walking along the beach, as described in *Glass*.

## Location of the OHWM

[27] The trial court determined the State holds in public trust "the land below the OHWM, as defined by 312 Ind. Admin. Code § 1-1-26(2) [sic]," and that Gunderson "cannot unduly impair the protected rights and uses of the public when the titles to the land overlap." (Appellants' App. at 28.) Gunderson argues at length that the State cannot, by regulation, take property or determine boundaries because its statutory authority does not permit it. The State argues it has authority to determine the scope of the public trust.

[28] In *Shively v. Bowlby*, 152 U.S. 1, 41 (1894), the United States Supreme Court decided when there was no administratively-set OHWM, there existed a common-law OHWM. In 1995, the DNR enacted 312 IAC 1-1-26(2), which reads: "'Ordinary high watermark' means . . . the shore of Lake Michigan at

owners sought a declaration that they held title to the land between the ordinary high-water mark and the actual legal boundary of their properties as defined by their deeds, and that the public trust did not include nonsubmerged lands. The Ohio Supreme Court determined the territory of Lake Erie held in trust by the state for the people extends to the "natural shoreline," which is "the line at which the water usually stands when free from disturbing causes." *Id*. at 950. "This court has a history of protecting property rights, and our decision today continues that long-standing precedent." *Id*. at 949. However, *Merrill* is distinguishable because the holding relied upon long-established Ohio precedent and Ohio state law which specifically stated the location of the property line in relation to Lake Erie, neither of which we have in this case.

five hundred eighty-one and five-tenths (581.5) feet I.G.L.D.,[11] 1985 (five hundred eighty-two and two hundred fifty-two thousandths (582.252) feet N.G.V.D.,[12] 1929)." (footnotes added)

[29] Alliance-Dunes argues the DNR is without authority to set the OHWM as it did in 312 IAC 1-1-26(2). Regulations set forth by administrative boards "must be reasonable and reasonably adapted to carry out the purpose or object for which these boards were created. *Potts v. Review Bd. of Indiana Emp't Sec. Div.*, 438 N.E.2d 1012, 1015 (Ind. Ct. App. 1982). "If the rules are in conflict with the state's organic law . . . they are invalid." *Id.* We hold 312 IAC 1-1-26(2) is in conflict with well-established case law regarding the state's ability to regulate the shores of Lake Michigan.

[30] In *Lake Sand* we held: "The state in its sovereign capacity is without power to convey or curtail the right of its people in the bed of Lake Michigan." 120 N.E. at 716. As the OHWM prior to 1995 was the common law OHWM as held in *Shively*, 152 U.S. at 41, the DNR's staking the OHWM at the measurements set forth in 312 IAC 1-1-26(2) most certainly conveyed or curtailed the rights of the people of Indiana in Lake Michigan. Therefore, that portion of the Indiana

---

[11] "International Great Lakes Datum (IGLD) is a reference system by which Great Lakes water levels are measured." Kilbert, *The Public Trust Doctrine and the Great Lakes Shores*, 58 Clev. St. L. Rev. at 58 n.43.

[12] NGVD stands for National Geodetic Vertical Datum. http://www.acronymfinder.com/National-Geodetic-Vertical-Datum-(NGVD).html (last visited July 27, 2016).

Administrative Code is invalid, and the OHWM remains that defined by common-law.[13]

## Gunderson's Northern Boundary

[31] Gunderson asserts the deed establishes Lake Michigan as the northern boundary of the Gunderson Property. The trial court found the Gunderson deed,[14] the plat to which it refers, and a survey

> reference no northern dimension other than that the lots are within Section 15. As a matter of interpretation, and common sense, if a lot is carved from within a section, the boundaries of that lot can be no greater than those of the section from which it was carved. Therefore, this Court finds that the Gundersons'

---

[13] The factors used to define OHWM under the common law are also found in 312 IAC 1-1-26(1). *Compare Glass*, 703 N.W.2d at 72:

> [The ordinary high water mark is] the point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic. And where the bank or shore at any particular place is of such a character that is impossible or difficult to ascertain where the point of ordinary high-water mark is, recourse may be had to other places on the bank or shore of the same stream or lake to determine whether a given stage of water is above or below ordinary high-water mark.

(quoting *Diana Shooting Club v. Hustin*, 156 Wis. 261, 272, 14 N.W. 816 (1914)) *with* 312 IAC 1-1-26(1):

> "Ordinary high watermark" means the following:
>
> (1) The line on the shore of a waterway established by the fluctuations of water and indicated by physical characteristics. Examples of these physical characteristics include the following:
>
> (A) A clear and natural line impressed on the bank.
>
> (B) Shelving.
>
> (C) Changes in character of the soil.
>
> (D) The destruction of terrestrial vegetation.
>
> (E) The presence of litter or debris.

[14] The deed Gunderson designated is the deed from Don and Bobbie Gunderson to the "Don H. Gunderson Living Trust," (App. at 109), not the deed originally conveying the land to the Gundersons.

deed conveyed no title north of Section 15's northern boundary. However, this Court notes that it is without evidence showing where the northern boundary of Section 15 currently lies in relation to the Gundersons' lots and the OHWM.

(*Id.* at 26.)  We acknowledge evidence that notes an 1829 survey says the lots run "to Lake Michigan and set post.[15]"  (Appellants' App. at 589) (footnote added).  A 1984 survey indicates the northern boundary of the lots in the plat is "LAKE EDGE." (*Id.* at 127.)  While we agree with the logic, we diverge slightly from the trial court's finding based on the evidence in the record before us.

[32]  The designated evidence indicates the boundary of Section 15 is Lake Michigan.  We held above, based on *Glass*, Gunderson's property rights overlap with those of the public trust.  Therefore, the northern boundary of Gunderson's property is the ordinary low water mark, subject to the public's rights under the public trust doctrine up to the OHWM.  *See Glass*, 703 N.E.2d at 69-70 (regarding overlap of jus privatum and jus publicum); *see also Korrer*, 148 N.E. at 623 (intervening shore space between ordinary low and ordinary high water marks are property of land owner, subject to the public's rights thereto); *Shaffer*, 141 A.2d at 585 (private title subject to public rights between ordinary low and ordinary high water marks); *and Bess*, 5 Cal. Rptr. 2d at 401

---

[15] The meaning of "set post" is unclear from the record but, based on the context, it would seem the term indicates the demarcation of the property line.  Based on the 1984 survey, no physical post exists.

(private title subject to public rights between ordinary low and ordinary high water marks).

# Conclusion

[33] We affirm the trial court's findings regarding the nature and scope of the public trust as it relates to Lake Michigan. However, we reverse the trial court's determination of the OHWM's location.

[34] Gunderson owns legal title up to the northern boundary of Section 15, and the State holds the land below the OHWM as defined at common law. The designated evidence consistently indicates the northern boundary of Section 15 is Lake Michigan. Therefore, we reverse the trial court's finding northern boundary of Section 15 is unknown, and hold the northern boundary of Section 15 is the ordinary low water mark, subject to the public's rights as part of the public trust.

[35] Affirmed in part and reversed in part.

Baker, J., and Brown, J., concur.