ATTORNEYS FOR APPELLANTS/CROSS-APPELLEES

Michael V. Knight
Barnes & Thornburg LLP
South Bend, Indiana

Peter J. Rusthoven
John R. Maley
Leah L. Seigel
Barnes & Thornburg LLP
Indianapolis, Indiana

Mark L. Phillips
Newby, Lewis, Kaminski & Jones, LLP
LaPorte, Indiana

ATTORNEYS FOR AMICUS CURIAE
RAY CAHNMAN AND PACIFIC LEGAL FOUNDATION

Mark Miller
Pacific Legal Foundation
Palm Beach Gardens, Florida

Paul Edgar Harold
Stephen M. Judge
LaDue Curran & Kuehn, LLC
South Bend, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

Thomas M. Fisher
Solicitor General

Andrea E. Rahman
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEES/CROSS-APPELLANTS
ALLIANCE FOR THE GREAT LAKES AND SAVE THE
DUNES

Jeffrey B. Hyman
Conservation Law Center
Bloomington, Indiana

ATTORNEYS FOR APPELLEES/CROSS-APPELLANTS
LONG BEACH COMMUNITY ALLIANCE, ET AL.

Kurt R. Earnst
Braje, Nelson & Janes, LLP
Michigan City, Indiana

Patricia F. Sharkey
Environmental Law Counsel, PC
Chicago, Illinois



FILED

Feb 14 2018, 11:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# In the
# Indiana Supreme Court

No. 46S03-1706-PL-423

DON H. GUNDERSON AND BOBBIE J.
GUNDERSON, CO-TRUSTEES OF THE DON H.
GUNDERSON LIVING TRUST,

*Appellants/Cross-Appellees*
*(Plaintiffs below),*

v.

STATE OF INDIANA, INDIANA DEPARTMENT
OF NATURAL RESOURCES,

*Appellees (Defendants below),*

ALLIANCE FOR THE GREAT LAKES AND
SAVE THE DUNES,

*Appellees/Cross-Appellants*
*(Intervenors-Defendants below)*,

LONG BEACH COMMUNITY ALLIANCE,
PATRICK CANNON, JOHN WALL, DORIA
LEMAY, MICHAEL SALMON, AND THOMAS
KING,

*Appellees/Cross-Appellants*
*(Intervenors-Defendants below)*.

—————————————————

Appeal from the LaPorte Superior Court, No. 46D02-1404-PL-606
The Honorable Richard R. Stalbrink, Jr., Judge

—————————————————

On Petition to Transfer from the Indiana Court of Appeals, No. 46A03-1508-PL-1116

—————————————————

**February 14, 2018**

**Massa, Justice.**

A century ago, our Court of Appeals recognized that, among those rights acquired upon admission to the Union, the State owns and holds "in trust" the lands under navigable waters within its borders, "including the shores or space between ordinary high and low water marks, for the benefit of *the people of the state*." *Lake Sand Co. v. State*, 68 Ind. App. 439, 445, 120 N.E. 714, 716 (1918) (quoting *Ex parte Powell*, 70 Fla. 363, 372, 70 So. 392, 395 (1915)). And Indiana "in its sovereign capacity is without power to convey or curtail the right of its people in the bed of Lake Michigan." *Id.* at 446, 120 N.E. at 716. This Court has since affirmed these principles. *See State ex rel. Indiana Department of Conservation v. Kivett*, 228 Ind. 623, 630, 95 N.E.2d 145, 148 (1950). But the question remains: What is the precise boundary at which the State's ownership interest ends and private property interests begin?

Today, we hold that the boundary separating public trust land from privately-owned riparian land along the shores of Lake Michigan is the common-law ordinary high water mark and that, absent an authorized legislative conveyance, the State retains exclusive title up to that boundary. We therefore affirm the trial court's ruling that the State holds title to the Lake Michigan shores in trust for the public but reverse the court's decision that private property interests here overlap with those of the State.

## Facts and Procedural History

Don H. Gunderson and Bobbie J. Gunderson, as trustees of the Don H. Gunderson Living Trust ("the Gundersons"), own lakefront property in Long Beach, Indiana, consisting of three lots in Section 15 of Michigan Township (the "Disputed Property"). The Gundersons' deed, the 1914 plat to which the deed refers, and the plat survey contain no reference to a boundary separating the Disputed Property from Lake Michigan to the north. A designated survey of Long Beach from 1984 contains a plat map showing the Disputed Property and contiguous lakefront lots extending to the "Lake Edge." App. 127–43. At the root of the Gundersons' deed is an 1837 federal land patent. This patent, in turn, originates from an 1829 federal survey showing Lake Michigan as the northern boundary of Section 15. The original survey notes indicate the northern boundary extends "to Lake Michigan and set post." App. 589.

In 2010, the Town of Long Beach passed an ordinance adopting the Indiana Department of Natural Resources' ("DNR") administrative boundary which separates state-owned beaches from private, upland portions of the shore. Long Beach, Ind., Code of Ordinances § 34.30 (amended 2012); 312 Ind. Admin. Code 1-1-26(2) (2017). The Gundersons, along with other

3

lakefront property owners in Long Beach, protested that the artificial boundary line infringed on their property rights.[1]

Following unsuccessful attempts at changing the rule at the administrative level, the Gundersons, in 2014, sued the State and the DNR (collectively, "the State") for a declaratory judgment on the extent of their littoral rights to the shore of Lake Michigan and to quiet title to the Disputed Property.[2] Alliance for the Great Lakes and Save the Dunes ("Alliance-Dunes") and Long Beach Community Alliance ("LBCA") (collectively, "Intervenors") successfully moved to intervene. All parties filed cross-motions for summary judgment. The Gundersons asked the trial court to rule that "there is no public trust right in any land abutting Lake Michigan." App. 83. The State, in turn, requested the trial court to declare that Indiana owns the disputed beach in trust for public use. Intervenors urged the trial court to find that the State owns the disputed shore of Lake Michigan below the ordinary high water mark ("OHWM") in trust for public recreational use.

In granting the State and Intervenors' cross-motions for summary judgment, the trial court ruled "that when Indiana became a State, it received, and held in trust for the public, all lands below the OHWM regardless of whether the land is temporarily not covered by the water." App. 25. The court further concluded that the Gundersons' property extends to the northern boundary of Section 15 while the State holds legal title, in public trust, to the land below the OHWM as defined by the DNR's administrative boundary. To the extent that these property interests overlap,

---

[1] In response, the Gundersons and others filed suit against the Town of Long Beach. That case is currently held in abeyance after the Court of Appeals ruled that the State was a necessary party. *LBLHA, LLC v. Town of Long Beach*, 28 N.E.3d 1077, 1091 (Ind. Ct. App. 2015).

[2] Owners of land abutting a lake or pond acquire "littoral" rights, whereas owners of land adjacent to a river or stream possess "riparian" rights. *Bass v. Salyer*, 923 N.E.2d 961, 970 n.11 (Ind. Ct. App. 2010); 78 Am. Jur. 2d Waters § 33 (2018). Because "riparian" is commonly used in reference to both classes of ownership, we will use that term here. *Bass*, 923 N.E.2d at 970 n.11.

the trial court declared that "the Gundersons cannot unduly impair the protected rights and uses of the public." App. 28. Finally, the trial court concluded that "Indiana's public trust protects the public's right to use the beach below the [OHWM] for commerce, navigation, fishing, recreation, and all other activities related thereto, including but not limited to boating, swimming, sunbathing, and other beach sport activities." App. 31.

The Gundersons appealed while Intervenors moved to correct the trial court's findings on the administrative OHWM and the overlapping titles. Alliance-Dunes moved for judicial notice of additional facts and to supplement the record, to which the State and the Gundersons objected. The court denied all pending motions and Alliance-Dunes and LBCA separately appealed.

The Court of Appeals affirmed in part and reversed in part. In a unanimous opinion, the panel held (1) that, absent an express legislative abrogation of public trust rights in the shores of Lake Michigan, those rights are controlled by the common-law public trust doctrine; (2) that the DNR's administrative boundary is invalid and the OHWM remains that defined by the common law; and (3) that the northern boundary of the Gundersons' property extends to the ordinary low water mark, subject to public use rights up to the OHWM, such as walking along the beach and gaining access to the public waterway. *Gunderson v. State*, 67 N.E.3d 1050, 1060 (Ind. Ct. App. 2016).

All parties—the Gundersons, the State, and Intervenors—petitioned this Court for transfer, which we granted, thus vacating the Court of Appeals opinion. Ind. Appellate Rule 58(A).

**Standard of Review**

We review summary judgment applying the same standard as the trial court: "summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue

5

as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting Ind. Trial Rule 56(C)). On cross-motions for summary judgment, "we simply consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *In re Indiana State Fair Litig.*, 49 N.E.3d 545, 548 (Ind. 2016) (citation omitted). We limit our review to the materials designated at the trial level. *Fraternal Order of Police, Lodge No. 73 v. City of Evansville*, 829 N.E.2d 494, 496 (Ind. 2005).

Where the challenge to summary judgment raises pure questions of law, we review them de novo. *Ballard v. Lewis*, 8 N.E.3d 190, 193 (Ind. 2014).

**Discussion and Decision**

The basic controversy here is whether the State holds exclusive title to the exposed shore of Lake Michigan up to the OHWM, or whether the Gundersons, as riparian property owners, hold title to the water's edge, thus excluding public use of the beach.[3] All parties agree that land below Lake Michigan's OHWM is held in trust for public use. The legal dispute relates to the precise location of that OHWM: whereas the Gundersons argue that it lies wherever the water meets the land at any given moment, the State and Intervenors locate the boundary further landward to include the exposed shore.

---

[3] The State contends that this case was rendered moot when, in March 2015, the Gundersons sold the Disputed Property to a real estate developer. Although the record reveals that the parties knew or should have been aware of the sale at the time, the Gundersons neglected to formally notify the court of the transfer in ownership until March 2017. For this reason, the State contends, the trial court had no opportunity to determine whether to allow the Gundersons to proceed after transferring their interest in the Disputed Property. *See* Ind. Trial Rule 25(C). Because this case involves "questions of great public interest," *Matter of Lawrance*, 579 N.E.2d 32, 37 (Ind. 1991) (internal quotations omitted), we need not decide the question of mootness on these procedural grounds.

Resolution of this case entails a two-part analysis: First, we must determine the boundary of the bed of Lake Michigan that originally passed to Indiana at statehood in 1816. Second, we must decide whether the State has since relinquished title to land within that boundary. The former question is a matter of federal law; the latter inquiry, a matter of state law. *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 376-77 (1977) ("[D]etermination of the initial boundary between [the beds of navigable waters] acquired under the equal-footing doctrine, and riparian fast lands [is] a matter of federal law . . . [whereas] subsequent changes in the contour of the land, as well as subsequent transfers of the land, are governed by the state law.").

We begin our discussion by providing some background on the public trust and equal-footing doctrines. The rule that the states, in their sovereign capacity, possess title to the beds of navigable waters has ancient roots. Under the English common law, "both the title and the dominion of the sea, and of rivers and arms of the sea, where the tide ebbs and flows, and of all the lands below high-water mark, within the jurisdiction of the crown of England, are in the king." *Shively v. Bowlby*, 152 U.S. 1, 11 (1894). The public interest—or *jus publicum*—encumbers the Crown's title—the *jus privatum*—to the waters, the shore, and the submerged lands, as "their natural and primary uses are public in their nature, for highways of navigation and commerce, domestic and foreign, and for the purpose of fishing by all the king's subjects." *Id.*

American colonists enjoyed common rights to the navigable waters "'for the same purposes, and to the same extent, that they had been used and enjoyed for centuries in England.'" *Id.* at 17 (quoting *Martin v. Waddell's Lessee*, 41 U.S. (16 Pet.) 367, 414 (1842)). At the conclusion of the American Revolution, the people of the original thirteen states, as successors to the Crown, "became themselves sovereign" and acquired "the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government." *Waddell's Lessee*, 41 U.S. (16 Pet.) at 410. Those states subsequently admitted to the Union, on an "equal footing" with the original thirteen, likewise acquired title to the lands underlying the waters within their boundaries that were navigable at the

7

time of statehood. *Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212, 230 (1845); *Utah v. United States*, 403 U.S. 9, 10 (1971) ("[T]he 'equal footing' principle has accorded newly admitted State the same property interests in submerged lands as was enjoyed by the Thirteen Original States as successors to the British Crown.") (citing *Pollard*, 44 U.S. (3 How.) at 222-23).

As the American public trust doctrine evolved, it assumed a character distinct from its English pedigree. In England, public rights attached only to those waters subject to the "ebb and flow of the tide." *The Propeller Genesee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443, 455 (1851), *superseded by statute as stated in Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 253 (1972). In abandoning this rule, the states recognized "the broad differences existing between the extent and topography of the British island and that of the American continent." *Barney v. City of Keokuk*, 94 U.S. 324, 338 (1876). The Treaty of 1783 with Great Britain after its surrender at Yorktown, and the Louisiana Purchase of 1803, had resulted in a massive acquisition of territory in the continental interior. And with this came vast stretches of navigable, non-tidal bodies of water, including the Great Lakes, recognized as "inland seas" by the U.S. Supreme Court. *The Genesee Chief*, 53 U.S. (12 How.) at 453; *Hardin v. Jordan*, 140 U.S. 371, 382 (1891) ("In this country the [right of the states to regulate and control the shores of tide-waters, and the land under them,] has been extended to our great navigable lakes, which are treated as inland seas."). The public trust doctrine thus migrated inland to embrace all navigable lakes and streams, not just the tidal waters along the eastern seaboard.

With this background in mind, we proceed with our analysis.

**I. At statehood, Indiana acquired exclusive title to the bed of Lake Michigan up to the natural OHWM, including the temporarily-exposed shores.**

The State of Indiana, upon admission to the Union in 1816, acquired title to the shores and submerged lands of all navigable waters within its borders. *Kivett*, 228 Ind. at 630, 95 N.E.2d at 148. The question here is where the boundary at which the State's ownership interest ends—and the Gundersons' property interest begins—is located. This is a question of federal law. *Borax Consol. v. City of Los Angeles*, 296 U.S. 10, 22 (1935) ("[T]he boundary between the upland and the tideland, is necessarily a federal question.").

The Gundersons argue that, by deed, they own the Disputed Property in absolute fee to the water's edge of Lake Michigan—i.e., the point at which the water meets the exposed shore at any given moment. By their theory, the water's edge is the legal boundary—a "movable freehold"— separating public trust lands from private property. App. 696. In support of their argument, they cite the Northwest Ordinance of 1787, the Submerged Lands Act of 1953, U.S. Supreme Court precedent, and other case law. These authorities, they contend, confine the State's public trust lands to the submerged lakebed, thus limiting public use to the waters only.

The State and Intervenors, on the other hand, contend that Indiana holds exclusive title to the bed of Lake Michigan up to the OHWM, including the exposed shores as the water periodically recedes. Absent evidence of an express federal grant prior to 1816, they contend, this title passed to Indiana at statehood under the equal-footing doctrine to hold in trust for public use.

For the reasons set forth below, we agree with the State and Intervenors.

9

*a. The Northwest Ordinance of 1787 had no bearing on the State's equal-footing title.*

The Gundersons trace Indiana's equal-footing title to the Northwest Ordinance of 1787. That federal measure guaranteed the admission of new states to the Union "on an equal footing with the original States" and specified that "[t]he navigable waters leading into the Mississippi and St. Lawrence . . . shall be common highways, and forever free." Act of Aug. 7, 1789, ch. 8, 1 Stat. 50, arts. IV-V (readopting Ordinance of July 13, 1787), *reprinted in* 1 U.S.C. at LVII (2012). The Gundersons interpret this language as limiting the public trust to the waters only.

Alliance-Dunes reject this argument. While acknowledging that the term "equal footing" first appeared in the Northwest Ordinance, they contend that the equal-footing doctrine originates solely in the U.S. Constitution. We agree.

The equal-footing doctrine was first discussed and applied by the U.S. Supreme Court in *Pollard*. In holding that the State of Alabama acquired title to the lands underlying tidal waters within its borders, the *Pollard* Court cited both the Northwest Ordinance and the statehood clause of the U.S. Constitution. 44 U.S. (3 How.) 212, 222–23 (1845). Despite this early reference and reliance on the Ordinance, however, the Court's equal-footing jurisprudence later curtailed—and eventually abandoned—that source of authority. In *Illinois Central Railroad Co. v. Illinois*, the Court, while acknowledging the Ordinance's equal-footing clause, concluded that "the equality prescribed would have existed if it had not been thus stipulated." 146 U.S. 387, 434 (1892). By the mid-twentieth century, the Court had put to rest any lingering theories over the effect of the Ordinance on determining equal-footing title, referring instead to statehood as triggering the acquisition of equal-footing lands. "In accordance with the constitutional principle of the equality of states," the Court declared in *United States v. Utah*, "the title to the beds of rivers within [the state] passed to that state when it was admitted to the Union, if the rivers were then navigable." 283 U.S. 64, 75 (1931).

Once equal-footing title passed to the State, it was free to establish different rules regarding public use or conveyance. *See Corvallis Sand*, 429 U.S. at 376. We acknowledge that several early cases in our State's history cited article IV of the Ordinance as a source of public rights in water. *See, e.g.*, *Cox v. State*, 3 Blackf. 193, 196 (Ind. 1833) (concluding that the Ordinance prohibited Indiana from "converting [navigable streams] to any other use than public highways, and from obstructing them with any artificial obstruction, and from levying any tax, impost, or duty on any of those citizens who may navigate them"); *Depew v. Bd. Trs. of Wabash & E. Canal*, 5 Ind. 8, 10 (1854) (concluding that the Ordinance prevented the State from "materially obstruct[ing]" navigable waters). By the mid-nineteenth century, however, a shift in judicial thought rendered the Ordinance inoperative following a state's admission to the Union. *See* G. Graham Waite, *Public Rights in Indiana Waters*, 37 Ind. L.J. 467, 468 n.2 (1962) (citing cases). The U.S. Supreme Court came to the same conclusion: "To the extent that it pertained to internal affairs," rather than interstate commerce, "the Ordinance of 1787—notwithstanding its contractual form—was no more than a regulation of territory belonging to the United States, and was superseded by the admission of the state . . . into the Union on an equal footing with the original states in all respects whatever." *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 120 (1921) (internal quotations omitted). *See also Huse v. Glover*, 119 U.S. 543, 546 (1886) (holding that provisions of the Ordinance "could not control the powers and authority of the State after her admission [and] that . . . it ceased to have any operative force, except as voluntarily adopted by her after she became a State of the Union").

We conclude that the Northwest Ordinance of 1787 had no effect on Indiana's title to the shores and submerged lands of Lake Michigan, either at the time of statehood or after. Stated simply, under the equal-footing doctrine, "the State's title . . . vests absolutely as of the time of its admission" to the Union. *Corvallis Sand*, 429 U.S. at 370-71. And while the Ordinance may have informed the states' understanding of public rights in water, those rights derive not from the Ordinance but from theories of sovereignty reaching back to our nation's founding.

11

*b. As a matter of law, the Federal land patent at the root of the Gundersons' deed conveyed no land below the OHWM.*

The Gundersons argue that their deed, the 1914 plat to which the deed refers, and the plat survey are *prima facie* evidence of title and fee simple ownership in the Disputed Property and that anyone claiming an ownership interest in their property must show superior title. The State and Intervenors deny this claim, contending instead that superior title to land below the OHWM vested in Indiana at statehood and that, as a matter of law, the federal land patent at the root of the Gundersons' deed conveyed no land below that boundary. We agree with the State and Intervenors.

The deed to the Disputed Property originates from an 1837 federal land patent, granting fractional section 15 to the Gundersons' predecessor-in-interest, William Wiggins Taylor. As a general policy and practice, the federal government did not survey or patent land below the OHWM of navigable water bodies. U.S. Dep't of the Interior, Bureau of Land Mgmt., *Manual of Surveying Instructions for the Survey of Public Lands of the United States* 5 (2009) ("Beds of navigable bodies of water are not public domain lands and are not subject to survey and disposal by the United States."). As the U.S. Supreme Court in *Shively v. Bowlby* held, "[g]rants by congress of portions of the public lands within a territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high-water mark, and do not impair the title and dominion of the future state." 152 U.S. 1, 58 (1894). *See also Barney*, 94 U.S. at 338 (stating that the bed of a navigable water "properly belongs to the States by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its survey and grants beyond the limits of high water").

*Shively* acknowledged Congress's authority to make pre-statehood "grants of lands below high-water mark of navigable waters" as necessary "to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several states." 152 U.S. at 48. But such grants are extremely rare, *see Utah*

12

*Div. of State Lands v. United States*, 482 U.S. 193, 198 (1987) (identifying "only a single case"), and have no effect on the State's equal-footing title here. *See also* Bureau of Land Mgmt., *Manual of Surveying Instructions* at 5 (stating that, while "the Federal Government continued . . . to hold title to and administer unappropriated lands" following the "admission of the public domain States into the Union," sovereign authority "over the lands beneath navigable waters lies within the individual States upon statehood").

Thus, absent evidence of an express federal grant before 1816, the shore lands below Lake Michigan's OHWM were not available for conveyance to private parties.

### c. Indiana's equal-footing lands included the temporarily-exposed shores of Lake Michigan up to the natural OHWM.

The Gundersons cite various state and federal cases as well as the federal Submerged Lands Act in support of their argument that the water's edge is the legal boundary separating public trust lands from private property. In framing their argument, they rely on phrases such as "lands beneath navigable waters" and "up to the OHWM." The State and Intervenors reject this interpretation, likewise citing state and federal common law for the conclusion that State equal-footing lands need not be permanently submerged. We agree with the State and Intervenors.

A thorough examination of the authorities reveals that variations in characterizing equal-footing lands are simply alternative expressions of the same rule of law: lands on the waterbody side of the OHWM pass to new states as an incident of sovereignty, whereas lands on the upland

side of the OHWM are available for federal patent and private ownership.[4] *See, e.g.*, *Gibson v. United States*, 166 U.S. 269, 272 (1897) (acknowledging that, while subject to the federal navigational servitude, "the title to the *shore and submerged soil* is in the various states"); *Shively*, 152 U.S. at 58 (concluding that congressional grants of public lands "*bordering on or bounded by navigable waters . . .* leave the question of the use of the shores by the owners of uplands to the sovereign control of each state")[5]; *Pollard*, 44 U.S. (3 How.) at 230 (referring to the "shores and the soils under the navigable waters"); *Barney*, 94 U.S. at 336 ("[T]itle of the riparian proprietors on the banks of the Mississippi extends only to ordinary high-water mark, and that *the shore between high and low water mark, as well as the bed of the river, belongs to the State*."); *Corvallis Sand*, 429 U.S. at 379 (acknowledging that the "principle [that riparian lands did not pass under the equal-footing doctrine] applies to the banks and shores of waterways"); *Illinois Cent.*, 146 U.S. at 451 (referring to "lands adjacent to the shore of Lake Michigan"); *United States v. Carstens*, 982 F. Supp. 2d 874, 878 (N.D. Ind. 2013) ("The *land between the edge of the water of Lake Michigan and the ordinary high water mark* is held in public trust by the State of Indiana."); *Lake Sand*, 68 Ind. App. at 445, 120 N.E. at 716 ("Among the rights thus acquired by the [State] is the right to own and hold the lands under navigable waters within the state *including the shores or space between ordinary high and low water marks . . . .*") (quoting *Ex parte Powell*, 70 Fla. at 372, 70 So. at 395) (emphasis added in all citations).[6] Perhaps the Michigan Supreme Court articulated

---

[4] Even the term "water's edge," as used in federal surveys, refers to the OHWM. *See* Bureau of Land Mgmt., *Manual of Surveying Instructions* at 81-82 ("[W]hen the Federal Government conveys title to a lot fronting on a navigable body of water, it conveys title to the water's edge, meaning the OHWM."). *See also Glass v. Goeckel*, 703 N.W.2d 58, 76 n.29 (Mich. 2005) (noting "water's edge" often means "high water mark").

[5] As the *Shively* Court explained, "[t]he shore is that ground that is between the ordinary high-water and low-water mark." 152 U.S. at 12 (internal quotations omitted).

[6] Other Indiana sources of authority are consistent with the understanding that equal-footing lands need not be permanently submerged. *See, e.g.*, 1990 Ind. Op. Att'y Gen. No. 90-8 (Apr. 17, 1990) ("The State of Indiana owns the land lakewards of the ordinary high water mark on the Lake Michigan shore to the northern boundaries of the State in Lake Michigan."); 1978 Ind. Op. Att'y Gen. (Nov. 22, 1978) (concluding that "the State of Indiana owns the land

it best: The term OHWM "attempts to encapsulate the fact that water levels in the Great Lakes fluctuate. This fluctuation results in temporary exposure of land that may then remain exposed above where water currently lies." *Glass v. Goeckel*, 703 N.W.2d 58, 71 (Mich. 2005). And "although not immediately and presently submerged," this land "falls within the ambit of the public trust because the lake has not permanently receded from that point and may yet again exert its influence up to that point." *Id.*

Rather than positioning the OHWM at the water's edge, early American common law defined that boundary as the point "where the presence and action of water are so common and usual . . . as to mark upon the soil of the bed a character distinct from that of the banks, in respect to vegetation, as well as in respect to the nature of the soil itself." *Howard v. Ingersoll*, 54 U.S. (12 How.) 381, 427 (1851) (Curtis, J., concurring). *See also* Louis Houck, *A Treatise on the Law of Navigable Rivers* § 10, at 6-7 (1868) (quoting *Ingersoll*); 2 Henry Philip Farnham, *The Law of Waters and Water Rights* § 417, at 1461 (1904) (citing case law and using a definition similar to *Ingersoll* "which has in effect been adopted by the weight of authority").

The Gundersons similarly misconstrue the language of the Submerged Lands Act of 1953 ("SLA"), 43 U.S.C. §§ 1301-1356 (2012). The SLA recognizes "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States." *Id.* § 1311(a). "Lands beneath navigable waters" refers to "all lands within the boundaries of each of the respective States which are covered by nontidal waters that were navigable . . . at the time such State became a member of the Union . . . *up to the ordinary high water mark*." *Id.* § 1301(a)(1) (emphasis added). The SLA expressly includes the Great Lakes. *Id.* § 1301(b). The SLA "did not alter the scope or

lakewards of the ordinary high water mark on the Lake Michigan shore" and defining "lands beneath navigable waters" as "all lands covered by non-tidal waters up to the ordinary high water mark," indicated by "[p]hysical markings on the shore").

15

effect of the equal-footing doctrine." *Corvallis Sand*, 429 U.S. at 371 n.4. Rather, "[t]he effect of the Act was merely to confirm the States' title to the beds of navigable waters within their boundaries as against any claim of the United States Government." *Id. See also* S.J. Rep. No. 133, at 7, 60-61 (1953) (confirming that the equal-footing doctrine applies to the "shores of navigable waters" of the Great Lake states) (quoting *Pollard*, 44 U.S. (3 How.) at 229).

We hold that, as articulated in the common law and confirmed by the SLA, Indiana at statehood acquired equal-footing lands inclusive of the temporarily-exposed shores of Lake Michigan up to the natural OHWM.

### II. Indiana retains exclusive title up to the natural OHWM of Lake Michigan.

Having concluded that Indiana, at statehood, acquired exclusive title to the bed of Lake Michigan up to the natural OHWM, including the temporarily-exposed shores, we must now determine whether the State has since relinquished title to that land.

The Gundersons reiterate their argument that the Disputed Property extends to the water's edge because Indiana has surrendered its public trust rights in Lake Michigan. In support of their claim, they cite Indiana's Lake Preservation Act and precedent from this Court. Moreover, they contend that the DNR has no authority to establish or alter property boundaries or to acquire property rights by administrative definition of the OHWM.

The State and Intervenors argue that the State has not relinquished or transferred title to the Disputed Property. Such land below the OHWM, they contend, remains subject to state ownership and the public trust. Intervenors emphasize, and the State agrees, that Indiana may not alienate its trust property without specific legislative authorization and altogether lacks the power to "convey or curtail" public rights in Lake Michigan. *See Lake Sand*, 68 Ind. App. at 446, 120

16

N.E. at 716. The idea that riparian property owners and the State have overlapping title to the shore, they contend, is inconsistent with fundamental public trust doctrine and threatens public use. The State and Intervenors part ways, however, on whether the DNR's administrative boundary may supersede the common-law OHWM.

Resolution of this issue is a question of state law. *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 475 (1988) ("[I]t has been long established that the individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit."); *see also Shively*, 152 U.S. 57-58 ("The title and rights of riparian or littoral proprietors in the soil below high-water mark . . . are governed by the laws of the several states, subject to the rights granted to the United States by the constitution.").

We conclude that, with the exception of select parcels of land not in dispute here, Indiana has not relinquished its title to the shores and submerged lands of Lake Michigan.

### a. Absent an authorized legislative conveyance, Indiana may not relinquish its public trust lands.

The Gundersons make several arguments that Indiana has surrendered its public trust rights in the shores of Lake Michigan.[7] We address those arguments in turn.

---

[7] The Gundersons cite various cases from other Great Lakes states for their argument that private riparian ownership extends to the water's edge. *See Seaman v. Smith*, 24 Ill. 521 (Ill. 1860); *Brundage v. Knox*, 117 N.E. 123 (Ill. 1917); *State ex rel. Merrill v. Ohio Dep't. of Nat. Res.*, 955 N.E.2d 935 (Ohio 2011); *Doemel v. Jantz*, 193 N.W. 393 (Wis. 1923). However, each state has dealt with its public trust lands "according to its own views of justice and policy,

17

First, the Gundersons argue that Lake Michigan enjoys no public trust protections because lawmakers expressly excluded that body of water from Indiana's Lake Preservation Act. Ind. Code §§ 14-26-2-1, 3(b)(1) (2017). For this reason, they claim the right to exclude others from the shores above the water's edge. The State and Intervenors, on the other hand, argue that Indiana has not abrogated its common-law fiduciary responsibilities to Lake Michigan, either expressly or implicitly, through the Lake Preservation Act. We agree with the State and Intervenors.

When interpreting a statute, we "presume that the legislature is aware of the common law and intends to make no change therein beyond its declaration either by express terms or unmistakable implication." *Clark v. Clark*, 971 N.E.2d 58, 62 (Ind. 2012) (internal quotations omitted). Indiana courts may imply an abrogation of the common law only if "a statute is enacted which undertakes to cover the entire subject treated and was clearly designed as a substitute for the common law" or "the two laws are so repugnant that both in reason may not stand." *Irvine v. Rare Feline Breeding Ctr., Inc.*, 685 N.E.2d 120, 123 (Ind. Ct. App. 1997).

In 1947, the Indiana General Assembly enacted legislation declaring the public's "vested right in the preservation, protection and enjoyment of all of the public fresh water lakes" in the State "and the use of such waters for recreational purposes." 1947 Ind. Acts 1223 (codified as amended at I.C. § 14-26-2-5). The Lake Preservation Act is "[p]ublic trust legislation" intended to recognize "the public's right to preserve the natural scenic beauty of our lakes and to recreational

reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public." *Shively*, 152 U.S. at 26. Because of this, the *Shively* Court cautioned against "applying precedents in one state to cases arising in another." *Id.* We adhere to this sage advice in this section of our analysis.

values upon the lakes." *Lake of the Woods v. Ralston*, 748 N.E.2d 396, 401 (Ind. Ct. App. 2001). The Act, however, specifically excludes Lake Michigan from its ambit. I.C. §§ 14-26-2-1, 3(b)(1).

Despite this omission, the Act does not expressly abrogate the common-law public trust doctrine; it merely states that the Act "does not apply" to Lake Michigan. I.C. § 14-26-2-1. Moreover, we find nothing in the Act that conflicts with the common-law public trust doctrine as it applies to Lake Michigan. *See* I.C. § 14-26-2-5 (describing public rights).

Even if the legislature had intended to extinguish public trust rights in the shores of Lake Michigan, it lacked the authority to *fully* abdicate its fiduciary responsibility over these lands. *Illinois Cent.*, 146 U.S. at 453 ("The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.").

Our conclusion that the legislature has not extinguished public trust rights in the shores of Lake Michigan finds further support in other provisions of the Indiana Code. Under the State's submerged property statute, an "interested person may acquire title to submerged real property adjacent to and within the width of the land bordering on Lake Michigan and between the shore and the dock or harbor line" by applying to the DNR for a "permit to fill in, reclaim, and own the real property." Ind. Code § 14-18-6-4(1)(A) (2017). The permit is subject to approval by the governor. *Id.* The statute further requires a permit under Indiana Code chapter 14-29-1. I.C. § 14-18-6-4(1)(B). A permit under this chapter must not "[u]nreasonably impair the navigability of the waterway" or "[c]ause significant harm to the environment." Ind. Code § 14-29-1-8(c) (2017). *See also* I.C. § 14-29-1-4(b) (prohibiting an owner of land bordering navigable waters from extending a pier, dock, or wharf "further than is necessary to accommodate shipping and navigation"). A patent issued by the governor vests in the person "fee simple title to the real property that has been filled in and improved." I.C. § 14-18-6-7(a). However, such land remains encumbered by the

public trust. Before issuing a permit under Indiana Code chapter 14-29-1 (a requisite step under the submerged property statute), the DNR "shall consider [the] public trust" and the "likely impact upon the applicant and other affected persons, including the accretion or erosion of sand or sediments." 312 Ind. Admin. Code 6-1-1(f) (2017).

As further evidence that the State has relinquished its public trust lands, the Gundersons cite *Bainbridge v. Sherlock*, 29 Ind. 364 (1868). In that case, this Court considered "the rights of the navigator" to the use of the "banks and margins" along the Ohio River. *Id.* at 367. While acknowledging the public right to navigate these waters, this Court concluded that "there is no 'shore,' in the legal sense of that term; that is, a margin between high and low tide—the title to which is common." *Id.* Rather, the Court ruled, "[t]he banks belong to the riparian owner, and he owns an absolute fee down to low water mark." *Id.* Thus, "[i]f a navigator lands, without authority, on a barren bank, he is technically a trespasser for trampling over the pebbles." *Id.* at 371.

Alliance-Dunes counter that *Bainbridge* is historically unique to the Ohio River and has no application to Lake Michigan. For the reasons below, we agree with Alliance-Dunes.

First, the rule in *Bainbridge*—that the riparian owner possesses title to the low water mark of the Ohio River—originates from this Court's earlier decision in *Stinson v. Butler*, 4 Blackf. 285, 285 (1837) ("The proprietors of land situated in this State, and bounded on one side by the *Ohio* river, must be considered as owning the soil to the ordinary low-water mark."). *Stinson*, in turn, relied on *Handly's Lessee v. Anthony*, 18 U.S. (5 Wheat.) 374, 383 (1820), which ruled that, by virtue of the 1784 Virginia Act of Cession,[8] Indiana's southern boundary extended only to the low

---

[8] Deed of Cession from Virginia, 1784 Va. Acts (11 Hen.) 571, 572 (ceding "territory *northwest of* the river Ohio" to the United States) (emphasis added). By the terms of this deed, Virginia retained the bed of the Ohio River, title to

20

water mark of the Ohio River. Thus, the Court in *Stinson* reasoned, "the same mark must be considered as the boundary" of any title conveyance along the Ohio River, whether by the United States "or any of her grantees." 4 Blackf. at 285. Whatever the merits of this premise,[9] this Court has consistently applied the rule to cases involving questions of riparian title along our State's aqueous southern boundary. *See, e.g.*, *Talbott v. Grace*, 30 Ind. 389, 389-90 (1868) (holding that the public cannot, by prescription or custom, acquire a right "to land boats, and load and unload freight, and thus encumber the land" on the banks of the Ohio River); *Martin v. City of Evansville*, 32 Ind. 85, 86 (1869) ("The title of the riparian owner on the Ohio river, extends to low-water mark . . . ."); *Irvin v. Crammond*, 58 Ind. App. 540, 108 N.E. 539, 541 (1915) ("[I]t is thoroughly settled that where land is bounded by the Ohio river on the Indiana side, the title of the owner extends to low–water mark."). However, the rule has no application to other equal-footing lands within Indiana, including the shores of Lake Michigan. *See* 312 I.A.C. 6-1-1(b) ("In the absence of a contrary state boundary, the line of demarcation for a navigable waterway is the ordinary high watermark.").

Second, to the extent *Bainbridge* has generated reliance interests in land extending to the low water mark, decisions from this Court subsequent to that case have significantly narrowed its holding, adopting instead a more expansive view of public trust rights along the Ohio River. In *Martin v. City of Evansville*, this Court—while confirming riparian title to the low water mark of the Ohio River—ruled that the city "has the power, as a police regulation, to establish water lines

---

which vested in Kentucky upon statehood in 1792. *Handly's Lessee*, 18 U.S. (5 Wheat.) at 384; *Indiana v. Kentucky*, 136 U.S. 479, 508 (1890).

[9] The decision in *Bainbridge* received sharp criticism from contemporary legal commentators. "That the riparian owners on such a great navigable river as the Ohio, should have the absolute power to control the landing of vessels, and the right to charge, without legislative grant, for the use of the unimproved shores, is a position . . . that cannot be sustained," one treatise writer opined, "either on principle or authority. Such a doctrine, firmly established," he added, "would be subversive of the rights of free navigation." Louis Houck, *A Treatise on the Law of Navigable Rivers* 191 (1868).

and to make reasonable provisions for the protection of navigation, and for this purpose may undoubtedly prohibit the erection of buildings *below high-water mark* which would have a tendency to obstruct navigation." 32 Ind. at 86 (1869) (emphasis added). Similarly, in *Sherlock v. Bainbridge*, we determined that "riparian ownership does not carry with it the right to the exclusive and unrestricted use of the lands ordinarily covered by the water." 41 Ind. 35, 47 (1872) (quoting *Rice v. Ruddiman*, 10 Mich. 125, 140 (1862)). Such private use "must in all cases be subordinate to the paramount public right of navigation, and such other public rights as may be incident thereto." *Stinson*, 41 Ind. at 47. Without overturning the settled "rule of property" under *Stinson* and its progeny, this Court concluded that "[t]he right to navigate the river as a public highway includes, necessarily, the right to stop where the purposes of such navigation require it, for a reasonable length of time." *Id.* at 41, 44.

In concluding that *Bainbridge* and its progeny have no application to Lake Michigan, we do "not declare that what had been private property under established law no longer is." *Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 728 (2010). Rather, our decision serves to "clarif[y] property entitlements (or the lack thereof)" that may have been previously unclear. *Id.*

Finally, the Gundersons argue that the DNR has no authority to establish or alter property boundaries or to acquire property rights by administrative definition of the OHWM. *See* 312 I.A.C. 1-1-26(2). The Indiana Administrative Code contains two definitions of the OHWM. The first definition reflects the traditional common-law OWHM: "The line on the shore of a waterway established by the fluctuations of water and indicated by physical characteristics." 312 I.A.C. 1-1-26(1). These physical characteristics include a "clear and natural line impressed on the bank" or shore, shelving, changes in the soil's character, the absence of terrestrial vegetation, or the "presence of litter or debris." *Id.* The second definition adopts a fixed elevation—581.5 feet above

22

sea level—as the OHWM.[10] *Id.* 1-1-26(2). This definition applies exclusively to the shores of Lake Michigan. *Id.*

The State defends the administrative boundary by emphasizing its statutory authority over navigable waters and contiguous lands.[11] *See* Ind. Code § 14-19-1-1(9) (2017) (assigning to the DNR the "general charge of the navigable water of Indiana"); Ind. Code § 14-18-5-2 (2017) (specifying that state lands abutting a lake or stream are under "the charge, management, control, and supervision of the [DNR]"). As a practical matter, the State adds, the administrative boundary "provides notice to the State, the public, and private land owners of their zone of rights." App. 223. The common-law physical characteristics test, by contrast, "would lead to uncertainty regarding the boundary of riparian landowners and the extent of the DNR's regulatory jurisdiction." State's Pet. for Reh'g at 13.

Intervenors, for their part, contend that the legal boundary separating equal-footing lands from privately-owned riparian lands remains the natural OHWM. Absent a clear legislative directive, Alliance-Dunes argue, *Lake Sand* prohibits the DNR from changing this boundary as it threatens to alienate public trust lands.

---

[10] This fixed elevation is based on the International Great Lakes Datum, 1985 (commonly known as IGLD 1985), a reference system used to define water levels in the Great Lakes. *International Great Lakes Datum Update*, Coordinating Committee on Great Lakes Basic Hydraulic and Hydrologic Data (Oct. 6, 2015), http://www.greatlakescc.org/wp36/international-great-lakes-datum-update. *See also Burleson v. Dep't of Envtl. Quality*, 808 N.W.2d 792, 801 (Mich. App. 2011) (discussing same).

[11] In its Petition to Transfer, the State argues that, because no party formally requested such relief, "the propriety of establishing OHWM via administrative rule has never been properly before the courts" and thus should not have been addressed by the Court of Appeals. State's Pet. to Trans. at 19. As the State acknowledges, however, LBCA, in its memorandum on summary judgment, urged the trial court to use the common-law standard. Moreover, Alliance-Dunes explicitly challenged the validity of the regulation in its motion to correct error.

On this issue, we side with both the Gundersons and Intervenors.

First, "the legislature cannot delegate the power to make a law." *City of Carmel v. Martin Marietta Materials, Inc.*, 883 N.E.2d 781, 788 (Ind. 2008) (construing article IV, section 1 of the Indiana Constitution). It can only "make a law delegating power to an agency to determine the existence of some fact or situation upon which the law is intended to operate." *Id.* (internal quotations omitted). Moreover, the legislature may only "delegate rule-making powers to an administrative agency if that delegation is accompanied by sufficient standards to guide the agency in the exercise of its statutory authority." *Healthscript, Inc. v. State*, 770 N.E.2d 810, 814 (Ind. 2002). The statutory authority cited by the State merely assigns to the DNR general managerial responsibility over "the navigable water of Indiana" and State lands "adjacent to a lake or stream." I.C. §§ 14-19-1-1(9), 14-18-5-1, 2. Neither statutory provision contains legislative guidelines on regulating public trust lands, let alone "sufficient standards to guide the agency."[12] *Healthscript*, 770 N.E.2d at 814.

Second, the absence of a clear legislative directive prohibits the DNR from changing the OHWM, as it threatens to alienate public trust lands. *Lake Sand*, 68 Ind. App. at 445, 120 N.E. at 716 ("The state in its sovereign capacity is without power to convey or curtail the right of its people in the bed of Lake Michigan."); *accord Kivett*, 228 Ind. at 630, 95 N.E.2d at 148.

---

[12] Designated evidence reveals the DNR's conceded lack of authority in defining these boundaries. In executive meeting minutes from 2012, the DNR's Chief Legal Counsel, in discussing the "ongoing debate . . . as to who owns the lakeshore," suggested that "it's a public access issue that I believe should be addressed by the General Assembly[, which has] addressed public trust and public access in other respects in the law." App. 189. Counsel further expressed reluctance over whether the DNR "should decide what the public trust area is for all of Lake Michigan or for Long Beach, in particular." *Id.*

The common-law OHWM is a moveable boundary subject to the natural variability of the shoreline. Bureau of Land Mgmt., *Manual of Surveying Instructions* at 81 ("When by action of water the bed of the body of water changes, the OHWM changes, and the ownership of adjoining land progresses with it."). Riparian boundary law relies on the adaptive doctrines of accretion and erosion to account for these shoreline dynamics. Under the accretion doctrine, the riparian landowner gains property as the OHWM shifts lakeward due to the gradual deposit of sand or other material.[13] *Bath v. Courts*, 459 N.E.2d 72, 74 (Ind. Ct. App. 1984). The doctrine of erosion, by contrast, has the opposite effect: the riparian landowner loses property as the boundary shifts landward due to the gradual loss of shoreline.[14] 93 C.J.S. Waters § 187 (2017). These doctrines operate to maintain the status quo of relative rights to the shores of navigable waters. While the physical boundary shifts (e.g., shelving or terrestrial vegetation) the legal relationships—private riparian ownership and public trust title—remain the same. In other words, while accretion or erosion may change the actual location of the OHWM, the legal boundary remains the OHWM. *State Land Bd. v. Corvallis Sand & Gravel Co.*, 582 P.2d 1352, 1361 (Or. 1978). In contrast, the administrative OHWM—as a static boundary—fails to account for these shoreline dynamics. Thus, accretion may result in a diminution of public trust lands, in derogation of *Lake Sand*, 68 Ind. App. at 446, 120 N.E. at 716. Alternatively, erosion may result in the expansion of public trust lands at the expense of the riparian landowner, resulting in an uncompensated taking.[15] *See* U.S. Const. amend. V; Ind. Const. art. 1, sec. 21.

---

[13] The corollary to this doctrine is the doctrine of reliction, which refers to the gradual receding of water from the shore. 93 C.J.S. Waters § 234 (2017).

[14] The corollary doctrine here is submergence, which refers to the gradual disappearance of land due to rising water levels. 93 C.J.S. Waters § 187 (2017).

[15] Lake Michigan is especially prone to these shoreline dynamics. *See* Richard K. Norton et al., *The Deceptively Complicated "Elevation Ordinary High Water Mark" and the Problem with Using It on a Laurentian Great Lakes*

Generally, if administrative rules and regulations "are in conflict with the state's organic law, or antagonistic to the general law of the state[, then] they are invalid." *Potts v. Review Bd. of Indiana Emp't Sec. Div.*, 438 N.E.2d 1012, 1015-16 (Ind. Ct. App. 1982). However, we recognize that the administrative OHWM serves other valid purposes, namely as a jurisdictional benchmark for administering regulatory programs by the DNR and U.S. Army Corps of Engineers. *See International Great Lakes Datum*, Ind. Dep't of Natural Resources, https://www.in.gov/dnr/water/3659.htm (last visited Feb. 12, 2018); *Ordinary High Water Mark and Low Water Datum—Description*, U.S. Army Corps of Engineers, http://www.lre.usace.army.mil/Missions/Great-Lakes-Information/Links/Ordinary-High-Water-Mark-and-Low-Water-Datum (last visited Feb. 12, 2018).

For these reasons, we hold that the natural OHWM is the legal boundary separating State-owned public trust land from privately-owned riparian land.[16] However, because the administrative OHWM serves other valid purposes, we stop short of declaring it void.

---

*Shore*, 39 J. Great Lakes Research 527, 534 (Dec. 2013) (discussing historical and seasonal variations in water levels and concluding that "[the natural OHWM is] a much better mark of the past incidence of true ordinary high water, one that is much more stable over time (to the benefit of shoreland property owners) and much more likely to protect both privately owned structures and the state's public trust shorelands").

[16] We acknowledge that the character of the shore at a particular site may present difficulties in determining the precise location of the OHWM. In such cases, "recourse may be had to other sites along the same stream to determine the line." *Borough of Ford City v. United States*, 345 F.2d 645, 648 (3d Cir. 1965).

### III. At a minimum, walking along the Lake Michigan shore is a protected activity inherent in the exercise of traditional public trust rights.

The Gundersons reject the theory that the State has an overlapping interest in the Disputed Property. Any recognition of public rights in the shores abutting their property, they contend, must comport with the precedent that private property cannot be taken without just compensation. The State, in turn, suggests that the public has a right to stationary activities such as fishing and picnicking, rather than mere ambulatory recreation.

LBCA urges this Court to recognize reasonable and limited recreational public uses including fishing, boating, swimming, sunbathing, and other beach sports. These activities, they contend, are compatible with the Lake Preservation Act, the nature of Indiana's Lake Michigan shore, and documented historical uses of the beach. Alliance-Dunes, for their part, argue that Indiana should protect the rights of its residents to reasonable recreational activities—including fishing, boating, hunting, and nature tourism—to accommodate evolving public priorities. Such uses, they contend, have important economic and social functions in the Great Lakes region.

Finally, Amicus Curiae Pacific Legal Foundation argue that Indiana should limit its public trust doctrine to three public uses recognized at common law at the time of the federal constitution's ratification: fishing, commerce, and navigation. Anything more, they contend, is an unconstitutional taking. Alliance-Dunes refute the argument that federal law imposes such a limit on public use, arguing instead that, upon admission to the Union, states are free to determine the scope of public uses as they see fit.

The waters and public trust lands of Lake Michigan are subject to a multitude of competing public and private interests: commercial transportation, riparian use, onshore industrial operations, and a vibrant tourism industry. "Indiana courts have tried to balance the[se] interests." Waite, *Public Rights in Indiana Waters*, 37 Ind. L.J. at 468. "Where the law tips too far in favor of the

27

littoral landowners, important public resources effectively are monopolized by a few. Where the law tilts too far in favor of the public, valuable private property rights get trampled by the many." Kenneth K. Kilbert, *The Public Trust Doctrine and the Great Lakes Shores*, 58 Clev. St. L. Rev. 1, 16 (2010).

Absent a statutory framework of public trust rights in the shores of Lake Michigan, this Court retains its common law powers to articulate—and even expand—the scope of protected uses. Indeed, a broad interpretation of protected uses accords with the view among courts that the "trust doctrine, like all common law principles, should not be considered fixed or static, but should be molded and extended to meet changing conditions and needs of the public it was created to benefit." *People ex rel. Scott v. Chicago Park Dist.*, 360 N.E.2d 773, 780 (Ill. 1976) (quoting *Borough of Neptune City v. Borough of Avon-By-The-Sea*, 294 A.2d 47, 54 (N.J. 1972)).

To the extent that we are asked to limit public use to the waters only, as the Gundersons suggest, such a restriction is impractical. There must necessarily be some degree of temporary, transitory occupation of the shore for the public to access the waters, whether for navigation, commerce, or fishing—the traditional triad of protected uses under the common-law public trust doctrine. *See Illinois Cent.*, 146 U.S. at 452. Thus, we hold that, *at a minimum*, walking below the natural OHWM along the shores of Lake Michigan is a protected public use in Indiana. This public right of passage, inherent in the exercise of the traditional protected uses we recognize today, would not infringe on the property rights of adjacent riparian landowners.

Beyond these protected uses, separation of powers compels us to exercise judicial restraint in this case. *See Fraley v. Minger*, 829 N.E.2d 476, 492 (Ind. 2005) ("The judiciary must respect the fact that the General Assembly is likewise a co-equal and independent branch."). Refraining from exercising our common law authority more expansively here is particularly prudent and appropriate where the legislature has codified, in part, our State's public trust doctrine. *See* I.C. §§ 14-26-2-1 to -25. Thus, we conclude that any enlargement of public rights on the beaches of Lake

28

Michigan beyond those recognized today is better left to the more representative lawmaking procedures of the other branches of government.

## Conclusion

For the reasons above, we affirm in part and reverse in part the trial court's grant of summary judgment for the State and Intervenors.

Rush, C.J., and David and Goff, JJ., concur.

Slaughter, J., not participating.