

IN THE

# Court of Appeals of Indiana

Castle Construction Corp., Michael Vaidik, Filip Zivkovic, and Ark Supplies, Inc.,

*Appellants-Defendants*

v.

Sharon Leibengood-Chavez,

*Appellee-Plaintiff*

FILED

May 29 2026, 10:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

May 29, 2026

Court of Appeals Case No.
25A-PL-1373

Appeal from the Lake Superior Court

The Honorable John M. Sedia, Judge

Trial Court Cause No.
45D01-2101-PL-25

## Opinion by Judge Foley
Judge Weissmann concurs. Chief Judge Tavitas dissents with
separate opinion.

**Foley, Judge.**

Castle Construction Corporation and Michael Vaidik ("Vaidik") (collectively, "Castle") appeal the order granting summary judgment to Sharon Leibengood-Chavez ("Homeowner") and denying Castle's cross-motion for summary judgment on claims that Castle violated the Home Improvement Contracts Act ("HICA"), i.e., Indiana Code chapter 24-5-11, and that Homeowner was entitled to damages under the Deceptive Consumer Sales Act ("the DCSA"), i.e., Indiana Code chapter 24-5-0.5. Concluding that neither HICA nor the DCSA applies under the circumstances, we reverse and remand for entry of summary judgment in favor of Castle. We also deny Homeowner's request for appellate attorney fees.

## Facts and Procedural History

Filip Zivkovic operated ARK Supplies, Inc. (collectively, "ARK"), and Vaidik operated Castle Construction Corporation. ARK was not licensed to perform home improvement work in the Town of Cedar Lake, but Castle was licensed to do so.

In 2019, Homeowner hired ARK to perform renovations on her residence in Cedar Lake, but ARK did not provide Homeowner with a home improvement contract. Homeowner was unaware that ARK was an unlicensed contractor. In October 2019, Castle obtained the building permit to perform a sunroom addition and construct a deck at Homeowner's residence. The building permit application listed Castle as the contractor, and Vaidik certified that the

information was true and correct, but ARK performed the renovations. ARK reimbursed Castle for the cost of the building permit. Homeowner did not meet with Castle; she never hired Castle to do work on her residence; she was unaware of Castle's involvement in the project; and Castle did not perform any work on Homeowner's residence. Homeowner sustained damages to her residence due to unworkmanlike construction performed by ARK.

[4] In January 2021, Homeowner filed a complaint for damages against ARK and Castle. Homeowner argued, in part, that Castle and ARK violated HICA, which "is actionable by a consumer as an incurable deceptive act under" DCSA. Appellants' App. Vol. 2 pp. 33, 42. Homeowner further argued that she was entitled to treble damages and attorney fees.

[5] ARK filed an answer but later failed to respond to Homeowner's requests for admissions, which were deemed admitted. Homeowner then filed a motion for summary judgment regarding her claim against ARK. ARK failed to respond to the motion for summary judgment, and on February 25, 2022, the trial court entered summary judgment in favor of Homeowner and against ARK for $150,000.00, which included treble damages, and an additional $17,410.20 in attorney fees.

[6] As for Castle, it initially failed to file an answer, and the trial court granted default judgment against Castle. Castle later filed a motion to set aside the default judgment, which the trial court granted. In November 2024, Homeowner filed a motion for summary judgment regarding her HICA claims

against Castle. Castle filed a response and a cross-motion for summary judgment. Castle argued that it was not a "supplier" under HICA. Ind. Code § 24-5-11-6. Alternatively, Castle argued that Homeowner failed to demonstrate "some actual injury as a result of Vaidik pulling a permit from the Town of Cedar Lake"; the renovations passed inspection by the Town; and ARK, not Castle, was the contracting party. Appellants' App. Vol. 2 p. 205. In response, Homeowner argued that Castle's "license lending" scheme violated HICA and the DCSA.

[7] In May 2025, the trial court granted summary judgment to Homeowner and denied Castle's cross-motion for summary judgment. The trial court concluded that Castle "committed a deceptive act in obtaining a permit from Cedar Lake for work that they knew they would not be performing." *Id.* at 26. The trial court further concluded that Homeowner "relied upon Castle and [ARK's] intentional non-disclosure of the fact that Castle pulled the Permit on behalf of [ARK], thereby facilitating the violation of IC 24-5-0.5-4(a) which entitles her to damages." *Id.* at 27.

[8] The trial court, thus, determined that Homeowner, not Castle, was entitled to summary judgment and that Homeowner was entitled to damages pursuant to the DCSA. The trial court entered a final judgment against Castle "in the amount of $167,410.20 inclusive of statutory treble damages for defects in workmanship and attorney fees incurred through February 25, 2022." *Id.* The trial court also set Homeowner's request for post-February 25, 2022 attorney fees for a hearing. Castle now appeals.

## Discussion and Decision

## I.      Summary Judgment

### A.      Standard of Review

Castle challenges the trial court's decision to grant Homeowner's motion for summary judgment and deny Castle's cross-motion for summary judgment. "We review summary judgment decisions de novo, and Trial Rule 56(C) supplies the framework." *Cave Quarries, Inc. v. Warex LLC*, 240 N.E.3d 681, 684 (Ind. 2024). "The moving party is entitled to summary judgment only if the evidence it designates in support of its motion 'shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* at 684–85 (quoting Ind. Trial Rule 56(C)). The purpose of summary judgment is to withdraw issues from the jury only when there are no genuine material factual issues for the jury to decide. *Id.* at 685. "Summary judgment is available when the nonmovant cannot prove its claim based on the undisputed evidence[.]" *Id.*

The summary judgment movant has the burden of making a prima facie showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Burton v. Benner*, 140 N.E.3d 848, 851 (Ind. 2020). The burden then shifts to the non-moving party, which must then show the existence of a genuine issue of material fact. *Id.* On appellate review, we resolve "[a]ny doubt as to any facts or inferences to be drawn therefrom . . . in favor of the non-moving party." *Id.*

"We limit our review to the materials designated at the trial level." *Gunderson v. State, Ind. Dep't of Nat. Res.*, 90 N.E.3d 1171, 1175 (Ind. 2018), *cert. denied*. The trial court entered findings and conclusions, which aid our review but do not bind us. *In re Supervised Estate of Kent*, 99 N.E.3d 634, 637 (Ind. 2018). Our standard of review and analysis are not altered by the parties' filing of cross-motions for summary judgment—we simply "consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Erie Indemnity Co. v. Estate of Harris*, 99 N.E.3d 625, 629 (Ind. 2018) (quoting *SCI Propane, LLC v. Frederick*, 39 N.E.3d 675, 677 (Ind. 2015)).

## B. Relevant Statutory Authority

The parties' arguments require that we interpret HICA and the DCSA. "A de novo standard of review applies to questions of statutory interpretation." *O'Connell v. Clay*, 267 N.E.3d 994, 999 (Ind. 2025). "When interpreting a statute, our goal is to 'determine and give effect to the intent of the legislature.'" *Finnegan v. State*, 240 N.E.3d 1265, 1269 (Ind. 2024) (quoting *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1196 (Ind. 2016)). "We start with the statute's text and afford 'its words their plain meaning and consider the structure of the statute as a whole.'" *Id.* (quoting *ESPN*, 62 N.E.3d at 1195). We are mindful of what a statute says and does not say. *Id.* "[W]e do not presume that the Legislature intended language used in a statute to be applied illogically or to bring about an unjust or absurd result." *Id.* (quoting *Anderson v. Gaudin*, 42 N.E.3d 82, 85 (Ind. 2015)). Moreover, in interpreting statutes, "courts should give effect to every word," avoiding interpretations that treat

some words of the statute as meaningless or surplusage. *Ind. Off. of Util. Consumer Couns. v. Duke Energy Ind., LLC*, 248 N.E.3d 1205, 1213–14 (Ind. 2024) (quoting *Cutchin v. Beard*, 171 N.E.3d 991, 997 (Ind. 2021)).

[13] Homeowner alleges that Castle violated both HICA and the DCSA. The purpose of HICA "is to protect consumers by placing specific minimum requirements on the contents of home improvement contracts." *Benge v. Miller*, 855 N.E.2d 716, 720 (Ind. Ct. App. 2006). To that end, HICA requires a real property improvement supplier performing any real property improvement in an amount greater than $150.00 to provide the consumer with a written contract. *See* I.C. §§ 24-5-11-4, -10; *Balash v. Mader*, 245 N.E.3d 705, 708 (Ind. Ct. App. 2024) (noting that "a real property improvement contract must be in writing and signed by both parties"). HICA defines "real property improvement supplier" as "a person who engages in or solicits real property improvement contracts whether or not the person deals directly with the consumer." I.C. § 24-5-11-6. A real property improvement supplier that violates HICA "commits a deceptive act that is actionable by the attorney general or by a consumer under IC 24-5-0.5-4 and is subject to the remedies and penalties under IC 24-5-0.5." I.C. § 24-5-11-14.

[14] Indiana Code section 24-5-0.5-4 is part of the DCSA. The purpose of the DCSA is to "(1) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices; (2) protect consumers from suppliers who commit deceptive and unconscionable sales acts; and (3) encourage the development of fair consumer sales practices." I.C. § 24-5-0.5-

1(b). The DCSA defines a "deceptive act" as, among other things, "[a] violation of IC 24-5-11 (concerning real property improvement contracts), as set forth in IC 24-5-11-14." I.C. § 24-5-0.5-3(24). "Incurable deceptive act" is defined as "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." I.C. § 24-5-0.5-2(8). At the time of this transaction, Indiana Code section 24-5-0.5-4(a) provided, in pertinent part:[1]

> A person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater. The court may increase damages for a willful deceptive act in an amount that does not exceed the greater of:
>
> (1) three (3) times the actual damages of the consumer suffering the loss; or
>
> (2) one thousand dollars ($1,000).
>
> [T]he court may award reasonable attorney's fees to the party that prevails in an action under this subsection. . . .

---

[1] The statute was amended effective July 1, 2020, effective July 1, 2023, and effective January 1, 2025, but no substantive changes were made to this language.

## C. Castle was not a supplier under HICA

Castle argues that Homeowner was not entitled to summary judgment on the HICA claim because Castle was not a "real property improvement supplier" under HICA. I.C. § 24-5-11-6. We agree.

HICA defines "real property improvement supplier" as "a person who engages in or solicits real property improvement contracts whether or not the person deals directly with the consumer." *Id.* The phrase "whether or not the person deals directly with the consumer" confirms that direct interaction with a homeowner is not required—but the definition still requires that the person "engage[] in or solicit[]" real property improvement contracts. *Id.* On appeal, the dispositive inquiry is what is meant by "engage[] in or solicit[] . . . ." *Id.*

Homeowner proffers a broad reading of the term "engage," arguing that because Castle obtained the building permit and listed itself as the contractor on the permit application, it "engaged" in the real property improvement contract between ARK and Homeowner, thus meeting the definition of a "real property improvement supplier." We disagree.

Where, as here, our legislature did not define a statutory term, our task is to "give the word its plain, ordinary, and usual meaning, consulting English language dictionaries when helpful in determining that meaning." *Moriarity v. Ind. Dep't of Nat. Res.*, 113 N.E.3d 614, 621 (Ind. 2019); *see also State v. Hancock*, 65 N.E.3d 585, 587 (Ind. 2016). Webster's Third New International Dictionary provides several definitions for "engage," among them: (1) "to bind (as oneself)

to do or to forbear doing something by or as if by a formal promise"; (2) "to pledge or commit (as oneself) to participate in some social or business activity"; (3) "to promise or pledge oneself"; (4) "to become pledged or answerable"; and (5) "to take part: participate . . . ."  Webster's Third New International Dictionary 751 (1976).  The American Heritage Dictionary provides similar definitions for "engage," which include: (1) "[t]o obtain or contract for the services of; employ"; (2) "[t]o involve oneself or become occupied; participate"; and (3) "[t]o assume an obligation; agree."  *Engage*, The American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=engage [https://perma.cc/H598-KHWG].  Moreover, Merriam-Webster defines "engage in" as (1) "to do (something); and (2) "to cause (someone) to take part in (something)."  *Engage In*, Merriam-Webster, https://www.merriam-webster.com/dictionary/engages%20in [https://perma.cc/R88D-VNHY].

[19]  In light of these dictionary definitions, we conclude that "engages in," as used in this context, is most naturally understood as meaning something closer to "enters into" than "participates in."  *See* I.C. § 24-5-11-6.  In reaching this conclusion, we observe that the definition of "supplier" is tied to engagement in "real property improvement *contracts*"—not a "real property *improvement*." *Compare id.* (emphasis added) (defining "real property improvement supplier") with I.C. § 24-5-11-3 (emphasis added) (defining "real property improvement"). HICA separately defines a "real property *improvement*" as "any alteration, repair, replacement, reconstruction, or other modification of residential real

property," including "[a]n exterior improvement" and "[a]n interior improvement." I.C. § 24-5-11-3 (emphasis added).

[20] We must be mindful both "of what a statute says" and what a statute "does not say." *Finnegan*, 240 N.E.3d at 1269. Understanding that HICA distinguishes between the *contract* and the *improvement*, we conclude that a party engages in or solicits a real property improvement contract by assuming a role as the contractor toward the consumer or in some manner performing tasks related to the formation of the contract with the homeowner. These actions or activities are distinct from performing tasks or acts required by the contractor under the terms of the contract (i.e., acts in furtherance of the *improvement* as opposed to the *contract*). Obtaining an administrative permit is merely performing a task required of the contractor under the terms of the contract (much as a subcontractor will often perform various subcomponents of the construction), and is distinct from performing tasks related to the formation of the contract.

[21] Our reading is confirmed by HICA's own structure. Indiana Code section 24-5-11-10(a)(9) requires a real property improvement supplier to disclose in its contract with the consumer whether any third party—including any subcontractor, vendor, or other person—"will lease or furnish any labor, services, material, equipment, or machinery to, or on behalf of, the real property improvement supplier in connection with the real property *improvement*." (emphasis added). The legislature drew a clear line between the supplier that contracts with the consumer and third parties that furnish labor or services to the supplier. If every third party were itself a "real property

improvement supplier," there would be no reason to require disclosure of the third party's involvement—each would independently owe an obligation to contract directly with the consumer. Thus, treating Castle as a supplier would render the disclosure requirement surplusage, contrary to our obligation to give effect to every statutory provision and avoid readings that would render statutory language meaningless or surplusage. *See Duke Energy*, 248 N.E.3d at 1213.

[22] Here, Castle was a third party that provided services to a general contractor. ARK was the entity hired by Homeowner to perform the renovation work such that ARK bore the obligation under Indiana Code section 24-5-11-10(a)(9) to disclose Castle's involvement. Castle's undisputed participation consisted of pulling a building permit for which ARK reimbursed the cost; Vaidik testified that Castle "was a bit involved in how the roofline was to be constructed," providing suggestions to ARK, but Castle ultimately performed no construction work. Appellant's App. Vol. 3 p. 38. Vaidik certified on the permit application that the information provided was true and correct, despite knowing that ARK would be performing the work, not Castle, and that ARK did not have a license to perform the work in the Town of Cedar Lake. But that certification ran to the town, not to Homeowner. It did not create a contractual relationship between Castle and Homeowner, and it did not satisfy the provision that Castle "engage[] in" a real property improvement contract to meet the definition of a "real property improvement supplier" under HICA. I.C. § 24-5-11-6.

[23]     We find support for our conclusion in *Stacy v. ASI Select Insurance Corp.*, 242 N.E.3d 525 (Ind. Ct. App. 2024). There, a homeowner argued that UDI—a subcontractor retained and paid by the original contractor, Greenwell, to make foundation repairs—was a HICA supplier because it performed work on the home. This court rejected that theory, concluding that UDI's contract was with Greenwell, not the homeowner, and HICA did not apply to UDI under the circumstances. *See id.* at 538. Here, Castle's position is at least as remote as UDI's—and, unlike UDI, Castle did not perform any work at the home. We consider the acts performed by Castle in this case—securing the permit on behalf of ARK—to be like the subcontracting acts performed by UDI. If a subcontractor who completed work at a home is not a HICA supplier, then a party who only pulled a permit for another contractor is not one either.

[24]     Homeowner argues that *Stacy* is distinguishable because, there, the homeowner was made aware of UDI's involvement and executed a release acknowledging it, whereas, here, Homeowner had no knowledge of Castle's role. That distinction does not affect the analysis. The homeowner's awareness of third-party involvement is not an element of the supplier definition and, therefore, has no bearing on whether Castle "engage[d] in" a real property improvement contract so as to be a supplier under HICA. I.C. § 24-5-11-6. When a third party's involvement is concealed from a consumer, HICA's remedy runs through the obligation it placed on the actual supplier—here, ARK—to disclose that third party involvement in the written contract. *See* I.C. § 24-5-11-10(a)(9).

Homeowner also argues that Castle's conduct—obtaining a permit while certifying it was serving as the contractor, enabling an unlicensed contractor to proceed with a project—was deceptive and caused her real harm such that "public policy favors a judgment in favor of [Homeowner]" in this action. Appellee's Br. p. 36. The equitable force of that argument is not lost on us. However, we are constrained by the language of the statute and the statutory framework enacted by the legislature. Under HICA, the "real property improvement supplier," I.C. § 24-5-11-6, had the obligation to disclose the use of subcontractors or third parties who may furnish or supply any labor, services, equipment or machinery to the supplier in connection with the real property improvement. Extending the supplier definition to reach Castle would override that structure and potentially sweep in every participant who touches a home improvement project, including a permit expediter or any type of subcontractor, supplier, or consultant. The statutory framework does not reflect intent for that result.[2]

Homeowner also invokes Indiana Code Section 24-5-11-9, which provides that when a license or permit is necessary for any part of a real property improvement, the contract "must be conditioned upon the *appropriate party* obtaining the necessary licenses or permits" before any work begins. (emphasis added). That provision reinforces rather than undermines our interpretation of

---

[2] Whether Castle's conduct gives rise to liability under some other legal or equitable theory is not a question before us today.

HICA. The obligation in Indiana Code section 24-5-11-9 attaches to the "real property improvement contract"—and specifically to the supplier who entered into that contract with the consumer. Because ARK contracted with Homeowner, ARK retained the obligation to ensure proper permitting. Castle's permit-pulling was a failure by ARK to comply with section 24-5-11-9, not an independent basis for Castle's own liability under HICA.

## D. Castle was not a supplier under the DCSA

Homeowner separately argues that Castle qualified as a "supplier" under the DCSA and was independently liable under the DCSA, regardless of whether Castle violated HICA. The DCSA creates its own supplier-liability framework that does not depend on a real property improvement contract. A "supplier" under the DCSA is "a seller, lessor, assignor, or other person who regularly engages in or solicits consumer transactions . . . whether or not the person deals directly with the consumer." I.C. § 24-5-0.5-2(a)(3)(A). A supplier who commits a "deceptive act" as defined in Indiana Code section 24-5-0.5-3— including, among other things, representing that it has "a sponsorship, approval, or affiliation in such consumer transaction the supplier does not have"—is subject to liability under the DCSA regardless of whether the deceptive act is a HICA violation. I.C. § 24-5-0.5-3(b)(7). Homeowner contends that Castle violated this provision because it held itself out as the licensed contractor of record on the permit application while knowing it would

not perform the work, and that this misrepresentation is actionable under the DCSA even if HICA does not apply to Castle.[3]

[28] This argument fails for the same reasons that foreclose HICA liability: the deceptive-act provisions apply only to a "supplier," and a person qualifies as a supplier under the DCSA only by regularly engaging in or soliciting consumer transactions. A "consumer transaction" is "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible . . . to a person for purposes that are primarily personal, familial, charitable, agricultural, or household." I.C. § 24-5-0.5-2(1). The alleged deceptive act—Castle misrepresenting itself as the contractor on the permit—was part of a commercial arrangement between two contractors. Homeowner was not a party to that arrangement. That the arrangement ultimately affected Homeowner's residence does not transform a business-to-business transaction into a consumer transaction. Under the DCSA, the pertinent inquiry is the character of the transaction, not simply that a consumer may suffer harm as a result of the transaction. For the reasons earlier discussed, Castle's permit-pulling for ARK and its representations to the Town of Cedar Lake did not amount to engagement in a consumer transaction. Nor does the statutory framework support Homeowner's proffered reading.

---

[3] On appeal, Homeowner is not arguing that—regardless of involvement in the instant project—Castle met the DCSA's definition of supplier because it regularly engaged in or solicited consumer transactions.

[29] In entering summary judgment for Homeowner on the DCSA claim, the trial court applied *Hoosier Contractors, LLC v. Gardner*, 212 N.E.3d 1234 (Ind. 2023), concluding the case confirms that a consumer who suffers actual injury and demonstrates detrimental reliance on a deceptive act may recover under the DCSA. That is an accurate statement of what is stated in *Hoosier Contractors*— but it presupposes that the defendant met the definition of a supplier. *Cf.* I.C. §§ 24-5-0.5-4(b) (authorizing actions "against [a] supplier"); 24-5-0.5-3 (prohibiting deceptive acts committed by "[a] supplier"). Because Castle was not a supplier under the DCSA, *Hoosier Contractors* does not apply. And whether Castle's conduct could give rise to liability under some other legal theory, such as common law fraud, is ultimately not a question before us.

[30] Because Castle was not a supplier under HICA or the DCSA, the trial court erred in entering summary judgment in favor of Homeowner. We, therefore, reverse and remand for entry of summary judgment in favor of Castle.[4]

## II.  Appellate Attorney Fees

[31] Homeowner requests appellate attorney fees pursuant to Indiana Code section 24-5-0.5-4(a), which authorizes awarding reasonable attorney fees to the "party that prevails" in an action under the DCSA. Because we are reversing the judgment against Castle and remanding for entry of summary judgment in favor

---

[4] Having concluded that Castle was not a supplier under either statute, we do not address Castle's alternative argument that the damages award was unsupported.

of Castle, Homeowner is not the prevailing party and is not entitled to appellate attorney fees. We, therefore, deny the request for appellate attorney fees.

## Conclusion

[32] Because Castle was not a real property improvement supplier under HICA and was not a supplier under the DCSA, the trial court erred in granting summary judgment to Homeowner and in denying Castle's cross-motion for summary judgment. We, therefore, reverse and remand for entry of summary judgment in favor of Castle.

[33] Reversed and remanded.

Weissmann, J., concurs
Tavitas, C.J., dissents with opinion.

ATTORNEYS FOR APPELLANTS

Kevin E. Steele
Burke Costanza & Carberry LLP
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE

Megan L. Craig
John R. Craig
Craig & Craig, LLC
Merrillville, Indiana

**Tavitas, Chief Judge, dissenting.**

[34] I respectfully dissent because I conclude that Castle qualifies as a "supplier" under HICA. Accordingly, I would affirm the trial court's grant of summary judgment to Leibengood-Chavez pursuant to HICA and conclude that she is entitled to appellate attorney fees. I, however, conclude that Leibengood-Chavez failed to meet her burden on summary judgment of demonstrating her actual damages, as required by HICA and DCSA. Accordingly, I would affirm in part, reverse in part, and remand for further proceedings.

## I. Castle was a supplier under HICA and DCSA.

[35] HICA defines "real property improvement supplier" as "**a person who engages in** or solicits real property improvement contracts **whether or not the person deals directly with the consumer**." Ind. Code § 24-5-11-6 (emphasis added). HICA further provides: "If a license or permit is necessary for any part of a real property improvement, the real property improvement contract must be conditioned upon the **appropriate party** obtaining the necessary licenses or permits before any work under the real property improvement contract commences." I.C. § 24-5-11-9 (emphasis added).

[36] The majority concludes that Castle did not "engage[ ] in or solicit[ ]" a contract with Leibengood-Chavez, but I disagree. The statute makes clear that a contractor can be a supplier under HICA even without direct interaction with the consumer. Accordingly, Castle's lack of direct interaction with Leibengood-Chavez is not determinative here. In fact, Castle, not ARK, obtained the

building permit, listing Castle as the contractor, and Vaidik specifically certified that the information on the application was true and correct. *See* I.C. § 24-5-11-9 (noting that "the real property improvement contract must be conditioned upon the appropriate party obtaining the necessary licenses or permits . . . ."). Under these circumstances, I conclude that Castle "engage[d] in" the contract by taking the affirmative step of obtaining the building permit and certifying that it was the contractor for the project. I conclude that Castle, thus, violated HICA. Accordingly, I would affirm the trial court's grant of summary judgment to Leibengood-Chavez on her HICA claim.

## II.    Issues of material fact exist regarding damages.

I, however, conclude that issues of material fact exist regarding Leibengood-Chavez's damages. A real property improvement supplier who violates HICA "commits a deceptive act that is actionable by the attorney general or by a consumer under IC 24-5-0.5-4 and is subject to the remedies and penalties" under DCSA. I.C. § 24-5-11-14. Pursuant to Indiana Code Section 24-5-0.5-4(a) of DCSA, Leibengood-Chavez was entitled to the following damages for a willful deceptive act[5]: "The court may increase damages for a willful deceptive act in an amount that does not exceed the greater of: (1) three (3) times the actual damages of the consumer suffering the loss; or (2) one thousand dollars ($1,000)." The statute also allows the trial court to award reasonable attorney

---

[5] Castle makes no argument regarding the trial court's determination of a willful deceptive act.

fees to the prevailing party. I.C. § 24-5-0.5-4(a). Accordingly, Leibengood-Chavez was entitled to receive up to three times her actual damages plus attorney fees.

[38] Although Leibengood-Chavez had the burden of demonstrating that no genuine issues of material fact existed regarding her "actual damages," I conclude that her designated evidence fails to meet this burden. Damages may not be awarded on the mere basis of conjecture and speculation. *Maples Health Care, Inc. v. Firestone Bldg. Prods.*, 162 N.E.3d 518, 528 (Ind. Ct. App. 2020). A damage award must be "supported by probative evidence" and "must reference some fairly defined standard, such as cost of repair . . . ." *Id.*

[39] Leibengood-Chavez's affidavit, which was designated in her motion for summary judgment, provided that: "As the result of the faulty workmanship by [ARK] using Castle's contractor's license, I have suffered damages," but she did not explain what those damages entailed. Appellee's App. Vol. 2 p. 217. Leibengood-Chavez stated that she received a judgment against ARK for $150,000, but she did not detail how those damages were calculated. She also designated the trial court's order against ARK, but that order also does not explain Leibengood-Chavez's damages. That order was based upon ARK's failure to respond to requests for admission rather than an actual presentation of damages. Leibengood-Chavez's complaint, which was also designated, likewise fails to explain her actual damages.

[40] Given this designated evidence, I conclude that Leibengood-Chavez failed to meet her burden of demonstrating that no genuine issues of material fact exist regarding her damages. Accordingly, I would reverse the damages award and remand for the trial court to determine Leibengood-Chavez's damages.

## III. Appellate Attorney Fees

[41] Next, Leibengood-Chavez argues that she is entitled to appellate attorney fees. Indiana Code Section 24-5-0.5-4(a) provides that, except in a circumstance not applicable here, "the court may award reasonable attorney's fees to the party that prevails in an action under this subsection. . . ." If Leibengood-Chavez had prevailed in this appeal, she would have been entitled to reasonable attorney fees, including appellate attorney fees. *See, e.g.*, *Benge v. Miller*, 855 N.E.2d 716, 722 (Ind. Ct. App. 2006) (noting that "an award of attorney fees [under the DCSA] includes appellate attorney fees"). I would find that Leibengood-Chavez did prevail and would remand for the trial court to determine Leibengood-Chavez's appellate attorney fees.

[42] In conclusion, I respectfully dissent. I conclude that the trial court properly granted Leibengood-Chavez's motion for summary judgment pursuant to HICA, except with respect to Leibengood-Chavez's damages. Accordingly, I would affirm in part, reverse in part, and remand for the trial court to determine Leibengood-Chavez's damages and to award Leibengood-Chavez's appellate attorney fees.